## UNITED STATES v. WOMEN'S SPORTSWEAR MFRS.' ASS'N et al.
### No. 4029.

District Court, D. Massachusetts.
Dec. 10, 1947.

William T. McCarthy, U. S. Atty., of Boston, Mass., Grant W. Kelleher, James M. Malloy, W. D. Kilgore and Paul T. O'Donoghue, Sp. Assts. to the Atty. Gen., for the U. S.

Harry Bergson, Abraham Wasserman and Maurice H. Finn, all of Boston, Mass., and Jacob Weinberg, of Brockton, Mass., for defendants.

HEALEY, District Judge.

This complaint was filed under Section 4 of the Sherman Anti-Trust Act, 15 U.S. C.A. § 4, against the defendants to prevent further alleged violations by them, jointly or severally, of Section 1 of the Act, 15 U.S.C.A. § 1.

The defendant, Women's Sportswear Manufacturers Association, hereinafter referred to as the "Association", is described as a voluntary unincorporated association composed of contractors in the Boston area who are engaged in the business of stitching women's sportswear apparel. The other defendants are firms, partnerships, corporations, associations or individuals, engaged as contractors in the business of stitching women's sportswear apparel, that are alleged to be members of the defendant Association, or officers or agents of the defendant Association.

It is alleged in the complaint that "acts done by defendant Association or defendant corporations were authorized, ordered and done by the officers, directors, agents and employees of such Association and corporations, including natural persons herein named as defendants."

After setting forth the nature of the trade and commerce involved, the complaint charges that the defendants have violated the Sherman Act as follows: "24. Beginning in the month of March 1944, and continuing thereafter up to and including the date of filing this complaint, the defendants have been and now are engaged in an unlawful combination and conspiracy to force all jobbers of women's sportswear located in the Boston Area to contract exclusively with the Women's Sportswear Manufacturers Association and its members for their stitching requirements on women's sportswear garments manufactured by such jobbers, which contracts unreasonably restrain the hereinbefore described interstate trade and commerce, in violation of Section 1 of the Act of Congress of July 2, 1890, 26 Stat. 209, as amended, commonly known as the Sherman Act. Defendants threaten to continue such offenses and will continue them unless the relief hereinafter prayed for in this complaint is granted."

The alleged terms of the conspiracy and combination are set forth in paragraph 25 of the complaint, and the alleged effects thereof are set forth in paragraph 26.

The complaint concludes with prayers for injunctions as follows:

1. That upon final hearing of this cause, the court order, adjudge and decree that the contracts, combination and conspiracy hereinabove described, constitute violations of Section 1 of the Sherman Act;

2. That the defendant, Women's Sportswear Manufacturers Association, and each of its defendant contractor members, be required to cancel the several agreements now in effect with the several jobbers under which the latter are required to designate the Association and its members as exclusive stitchers for women's sportswear manufactured by such jobbers, as well as to distribute their available business equally among such stitchers on terms imposed by such stitchers, and that the Association and each of its contractor members, their successors, transferees or assignees, be perpetually enjoined from making any new exclusive agreements, similar in nature, with any jobbers of women's sportswear in the Boston area;

3. That the Women's Sportswear Manufacturers Association be dissolved and that no new or other association be formed having the same purposes or objects;

4. That the contractor defendants and the members of the Women's Sportswear Manufacturers Association, and each of them, their committees, officers, directors, agents, employees, representatives, and all persons, associations or corporations acting or claiming to act on behalf of them or any of them, be perpetually enjoined and restrained from engaging in any concerted plan or action calculated to secure to defendants, or any of them, their successors, transferees or assignees, the exclusive right to service the stitching requirements of any manufacturer or jobber in the Boston area engaged in the manufacture and sale in interstate commerce, of women's sportswear apparel or the materials thereof, or to impose any compulsory method of allocating among such stitchers the stitching requirements of such jobbers or manufacturers;

5. That the plaintiff have such further and other relief as the nature of the case may require and as the court may deem necessary and proper in the premises.
and a prayer for costs.

### Findings of Fact.

Women's sportswear consists generally of jackets, skirts, slacks, shorts, blouses and jumper dresses made from wool, rayon and cotton fabrics. It is produced by jobbers who employ contractors to do the stitching and put on the necessary ornaments. The jobbers maintain places of business in Boston and vicinity. They all maintain sales offices in New York City. Some of them also maintain sales offices in other cities, and practically all of them employ salesmen who travel throughout the United States soliciting orders for women's sportswear.

At their places of business in Boston and vicinity, the jobbers cut the cloth or piece goods according to patterns designed by them, in accordance with the orders of their customers. They make their purchases of cloth through New York sales offices of the cloth-producing mills. These mills are located in various places outside of Massachusetts, as well as in Massachusetts. About 80% of the cloth used by the jobbers in the production of women's sportswear is manufactured in mills located outside of Massachusetts. At times, the cloth purchased is sent to the jobber's place of business directly from the mill; at other times, it is sent to the jobber from the mill agent in New York. Although a jobber may at times maintain an inventory of cloth, very few did so during the period covered by this complaint. Most of the cloth was purchased as a result of specific orders taken by the jobbers for sportswear.

As a general rule, a jobber employed outside of his sales force, only a designer, a pattern maker, one or more cutters, shipping clerks and office help. The defendant contractors have shops or factories in the Boston area, where they have installed sewing machines. The contractors do at least 50% of all the stitching of women's sportswear produced in the Boston area.

It is the custom in the trade for the contractor to return the finished garments to the jobber, who immediately sends them to the purchaser. Since the jobbers manufacture sportswear only on orders, they do not stock finished garments.

Boston is the fifth largest manufacturing center of women's sportswear in the United States, figured on the basis of the number of persons employed in that industry, being surpassed by Los Angeles, New York, Chicago and Philadelphia respectively. Women's sportswear manufactured in the Boston area is sold throughout the country in competition with like goods manufactured in the other areas. At least 65% of all the women's sportswear produced in Boston is handled by the defendants, and at least 80% of all the finished garments produced here is sold to purchasers located outside of Massachusetts. The annual gross value of the garments sold by the jobbers who signed the agreement with the defendant Association is about $8,800,000. The cost of stitching women's sportswear garments amounts to approximately 25% of the sales price of the garments.

The defendant Women's Sportswear Manufacturers Association, was organized at some time prior to December 1, 1943. It is an unincorporated association with a place of business in Boston, Massachusetts, composed of contractors who contract to perform the stitching operations on women's sportswear. All of the defendant contractors named in the complaint as being members of the defendant Association, with the exception of Hyman Medoff, were members of the defendant Association at some time during the period from March 1, 1944, to the date of the filing of the complaint. The defendants named in the complaint as officers or members of the executive committee of the defendant Association held their alleged positions at some time during the period from March 1, 1944, to the date of the filing of this complaint. The Association held meetings at the call of its secretary, who kept the minutes of the meetings. The defendant Rosenberg was the Executive Director of the defendant Association throughout the entire period covered by this complaint.

Beginning about March 1, 1944, the defendant Rosenberg notified certain jobbers that, in order for the contractors to operate their shops for said jobbers in the

future, it would be necessary to establish equitable and fair business dealings to remove abuses and evils which caused conflict and disputes between jobber and contractor, and that they must get in contact with him. This was done for the purpose of having the jobbers sign an agreement with the contractors concerning these matters.

A proposed written agreement, (plaintiff's Exhibit 3), required the jobber to employ only members of the defendant Association, to refrain from dealing with non-member contractors, to distribute his work equitably among the Association contractors engaged by him, to furnish the contractor with written orders setting out the price for the work, to refrain from accepting secret rebates, and to pay to the contractor the amount of the unemployment compensation insurance, health and vacation fund and Labor Day pay attributable to the services of the contractors' employees.

Despite the urging of defendant Rosenberg and members of the Association, the jobbers had not signed any agreement with the Association up to September 25, 1944. On that date, Rosenberg, by letter to a representative of the jobbers, threatened a stoppage of production by the Association and its member contractors on October 2, 1944, if the matter were not adjusted by September 30, 1944. Shortly thereafter, a conference was held between representatives of the jobbers and representatives of the defendant contractors to consider the proposed agreement. At that meeting, a representative of the jobbers pointed out their objections to the proposed agreement, and informed the contractors' representatives that the jobbers had obtained an opinion that the proposed agreement was illegal. The jobbers refused to sign the proposed agreement at that time.

On October 2, 1944, work was stopped in the shops of contractors who were doing work for jobbers, known as Kenniston Klassics, Banner Sportswear and College-Town Sportswear. The aforementioned jobbers were informed by their contractors that the reason for the work stoppage was their refusal to sign the proposed agreement with the defendant Association. These jobbers then obtained a restraining order in the state court and thereafter work on their goods was resumed by the contractors.

Although there was testimony that the representatives of the International Ladies' Garment Workers' Union had ordered a work stoppage by some of its members on goods of some of the jobbers in September of 1944, it appears that the stoppages in the abovementioned plants were ordered by the defendant Association because the owners of the jobber establishments refused to sign the agreement submitted to them by the defendant Association. The defendant contractors are independent contractors who are not members of or qualified for membership in the International Ladies' Garment Workers' Union. There is no evidence that said Union participated in drawing up the proposed agreement between the jobbers and contractors.

Shortly after the restraining order was issued by the state court, further negotiations between the Association and the jobbers took place. As a result of these negotiations, the proposed agreement was revised, and, as so revised was signed by 21 jobbers on October 17, 1944. (Plaintiff's Exhibit 4).

The signed agreement required, inter alia, that the jobber should give all of his work to Association contractors available for performance of his work, provided such contractor was comparable as to price and quality of work with non-member contractors, but if a member withdrew from the Association, he could finish the jobber's work already in hand; or, if any non-member contractor was, at the time of the signing of the Association's agreement, employed by a jobber under contract, the jobber could continue to employ such contractor, even if he did not become an Association member. The jobber was required to distribute his work equitably among Association contractors engaged by him and to furnish the contractor with a written order setting out the price, and was forbidden to receive secret rebates from the contractor. The jobber was required to deduct from the amount due the contractor, a sum computed by the defendant Association to cover unemployment compensation insurance and the health and vacation fund **of**

the contractors' employees. Compulsory arbitration of disputes between jobber and contractor was provided for, as were the mechanics for arbitration. All individual agreements between jobber and contractor were made subject to the provisions of this agreement. Other provisions required the Association to assist the jobber in getting sufficient contractors to do his work. The contractor agreed to complete all orders given him with due regard to the delivery dates set forth in the orders; and both the contractors and jobbers agreed that there should be no pirating of styles, and that styles submitted to a contractor by a jobber would not be submitted by the contractor to any other jobber.

This agreement was still in force at the time this complaint was filed. There is little, if any, substantial evidence as to just how the arrangement worked out.

One of the purposes of the Association was to maintain the standard of prices charged the jobbers for doing the stitching operations on the sportswear garments in the Boston area.

None of the defendant contractors performed any work on goods in a shop or establishment outside of Massachusetts. They did not receive any goods to be worked on from, nor did they deliver any completed sportswear garments to, any jobber or any one else outside of Massachusetts.

None of the defendants attempted to fix wholesale or retail prices of women's sportswear or to boycott any concern or interfere with the manufacture or sale of its goods outside of Massachusetts.

### Discussion.

■ The Sherman Act does not condemn every contract, combination or conspiracy which may in some degree interfere with interstate commerce. Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 486, 60 S. Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. Only those activities which are shown to be intentional restraints on commerce, or those which have such a direct and immediate effect upon commerce as to enable the court to draw an inference that they were intended to restrain commerce, are proscribed by the Act. Or, as stated in

United Leather Workers v. Herkert, 265 U.S. 457, 471, 44 S.Ct. 623, 627, 68 L.Ed. 1104, 33 A.L.R. 566, a case, like the instant one, involving an interference with manufacturing, " * * * It is only when the intent or the necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize its supply, or control its price, or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce."

There is no direct evidence that these defendants had any intention of restraining interstate commerce in cloth or in the finished sportswear garments. Unless, therefore, by their activities they actually or potentially monopolized the supply of these articles, controlled its price, or discriminated between would-be purchasers, they cannot be held to have so directly and immediately restrained commerce as to permit an inference of illegal intent.

It is to be noted that all the activities and operations of the defendants were confined exclusively to Massachusetts. None of the defendant contractors carried on any business in any other state or worked for any jobbers outside of Massachusetts. They neither received from, nor sent any goods to any one outside of Massachusetts. Also, none of the defendants attempted to fix any wholesale or retail prices for women's sportswear or to boycott any concern or its goods outside of Massachusetts.

■ However, the mere fact that the defendants were not themselves engaged in interstate commerce, would not exculpate their activities from the condemnation of the Act, if such activities constituted an unreasonable restraint on interstate commerce. Boyle v. United States, 7 Cir., 40 F.2d 49.

Unquestionably the prices charged by these contractors for stitching sportswear garments, are reflected in the wholesale and retail prices of the finished garments. Also, any work stoppage on the jobbers goods would slow down the stream of sportswear entering into interstate commerce and the purchase of cloth from out of state mills, as well as the taking of or-

ders for finished garments in other states. However, in my opinion, such results do not constitute sufficiently direct and immediate effects upon interstate commerce upon which to predicate an inference of illegal intent.

It has been held that interference with the manufacture of a product within a state, which completed product, to the knowledge of the alleged conspirators, was to be shipped in interstate commerce to fill orders already received and accepted from the Company's customers in other states, is not, without more, a direct and immediate restraint on interstate commerce within the scope of the Sherman Act, but, rather, it has merely an incidental, indirect and remote effect upon such commerce. Apex Hosiery Co. v. Leader et al, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Coronado Coal Co. et al. v. United Mine Workers of America, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; United Leather Workers v. Herkert, 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566; Industrial Association v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849.

It has also been decided that the fact that the raw materials used in the manufacture of a product have been purchased in another state and shipped interstate to the manufacturer, does not, of itself, render a contract or conspiracy prohibiting its manufacture into a finished product a direct and immediate restraint on interstate commerce. Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Levering & Garrigues Co. et al. v. Morrin et al., 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062; Industrial Association v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849.

Counsel for the government argue in their brief, however, that the instant case is one where there is a direct and immediate restraint upon "a stream of commerce" within the purview of the Act. They allege that the taking of orders in other states, the purchase of cloth in other states in pursuance of those orders, the manufacture of garments to fill the orders from cloth purchased in interstate commerce, and the shipment of the finished garments to the out-of-state purchasers, constitutes a flow or stream of commerce which the defendants directly and immediately restrained by their activities within Massachusetts.

In support of this argument, they cite the case of Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, and several cases decided under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. While it is true that in the Swift case the court referred to the trade in cattle and meat as a stream of commerce, they also found that the purpose of the conspiracy was to directly and immediately restrain interstate commerce for the purpose of price fixing. Had the court been unable to make such a finding, it seems reasonable to believe that a different result would have been reached. Swift & Co. v. United States, 196 U.S. 375, 397, 398, 25 S.Ct. 276, 49 L.Ed. 518; Anderson v. United States, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300; Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290.

That the term "affect commerce" used in the National Labor Relations Act, and the decisions construing it, does not expand the meaning of "restraint of * * * commerce" as used in the Sherman Act, was decided in Leader et al. v. Apex Hosiery Co., 3 Cir., 108 F.2d 71, which decision was affirmed in Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. See also Blankenship v. Kurfman, 7 Cir., 96 F.2d 450, 456. Therefore, cases like National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014, interpreting the Wagner Act, are not in point on this question.

In summary, there is no evidence of any intent on the part of the defendants, who had no direct and immediate connection with or control over interstate commerce, to burden interstate commerce. There was no evidence of any direct and immediate restraint upon interstate commerce resulting from the defendants' activities, from which an illegal intent can be

inferred. They did not seek to monopolize the supply of sportswear garments, or to control its price, or to discriminate between would-be purchasers. Their activities were purely local and directly affected only the manufacture of women's sportswear in Massachusetts. The effect of their activities on interstate commerce was indirect and too remote to bring them within the condemnation of Section 1 of the Sherman Act.

### Conclusion of Law.

On the basis of the above findings of fact, I conclude that none of the defendants committed any violations of the Sherman Act as alleged in the complaint.

The plaintiff's prayers for an injunction and other relief should be denied.

The Clerk will prepare an order for judgment for the defendants.