UNITED STATES *v.* WOMEN'S SPORTSWEAR MANUFACTURERS ASSOCIATION ET AL.

No. 37.  Argued February 28–March 1, 1949.—Decided March 28, 1949.

*Robert L. Stern* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Wm. Amory Underhill* and *Robert G. Seaks.*

*Harry Bergson* argued the cause and filed a brief for appellees.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The District Court, after trial, has denied the Government's plea for an injunction, and other relief, against appellees under the Sherman Act.[1]  75 F. Supp. 112. The cause is brought here by direct appeal, as Congress has authorized.[2]  Defendants below and appellees here are an unincorporated trade association, its officers and members.  There is no serious controversy as to facts. Our review must determine whether or not they establish the Government's right to the relief which has been denied.

We first should be satisfied that the activities on which restraints are alleged to have been exerted constitute commerce among states.  The industry involved is women's sportswear.  It is carried on by jobbers, who maintain sales offices in New York and engage in nation-wide competition for orders, chiefly by means of traveling salesmen who solicit throughout the country.  Upon receiving an order, the jobber buys the fabrics and cuts them to the customer's fancy.  In most cases he then sends the cut material to a contractor who does the stitching, puts on such accessories as the buttons and the bows, and returns the completed garments to the jobber, who promptly ships them to the customer.

That the jobbers maintain a current of commerce, substantial in volume and interstate in character, seems clear.  The Boston area ranks fifth in this country's production of women's sportswear.  Its jobbers obtain about 80% of the cloth used from sources outside of Massachusetts.  At least 80% of the finished sportswear

---

[1] Section 1 of the Act of July 2, 1890, c. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1.

[2] 15 U. S. C. § 29; 28 U. S. C. § 2101.

is sold and shipped to customers outside of that State. Thus the industry in Massachusetts subsists on a constant influx of cloth and outgo of garments which pass through the hands of the stitching contractors for an essential operation.

Our next inquiry is whether the accused combination, which is made up of stitching contractors, has imposed upon this interstate trade restraints of a character and magnitude to violate the Sherman Act. The Association is made up of members who handle at least 50% of all sportswear produced in Boston. The cost of this contractor's operation is about 25% of the jobber's sale price, and its variations are reflected in wholesale and retail prices. The Association's executive director took steps to induce jobbers to enter into a written agreement, among other things, to employ only members of the Association, refrain from dealing with nonmembers, and accept no secret price rebates. When the jobbers hesitated, stoppage of production was threatened; and when they refused because they were advised that it would violate antitrust laws, the Association ordered contractors to stop work for three jobbers, which was done, and work for them was not resumed until the jobbers obtained a state court injunction. The proposed agreement was then revised and ultimately was signed by twenty-one jobbers who handle a gross annual volume of about $8,800,000, that being a substantial portion of the Boston output.

The agreement in final form, together with the circumstances of its making, is alleged to constitute an illegal restraint of trade. Terms relevant to the issue require jobbers to give all of their work to available Association members who are in good standing with the International Ladies' Garment Workers' Union, provided such contractors are "comparable" as to price and quality of work with nonmember contractors having contracts with the same Union. The jobber is to furnish a written order speci-

fying price and is forbidden to receive secret rebates. A jobber can give work to a nonmember only in continuance of an existing relationship. The jobber will give no new contract to any stitcher who ceases to be a member of the Association. The Association agrees to assist the jobber in getting sufficient contractors as the amount of his work "may equitably require," and the jobber agrees that he will divide his work "as equally and equitably as possible among the Association Contractors engaged by him." The District Court found that one of the purposes of the Association was to maintain the standard of prices. The Government also recites evidence suggesting that the Association policed the membership to prevent price competition and excluded from membership "new comers in the trade."

In the light of its origin and the circumstances of the industry, it seems clear that the intent and effect of the agreement is substantially to restrict competition and to control prices and markets. It prohibits the jobbers from awarding work to others (with minor exceptions) unless their prices are not "comparable" to those of Association members. It effects for Association members a virtual monopoly of work at "comparable" prices. Work given to members must be allocated "equitably," not by reference to price or quality of work. And it apparently contemplates boycott by the Association of jobbers who do not subscribe to these terms. That such a contract restrains trade in violation of the Sherman Act is obvious, even if the restraints in actual practice under it do not go beyond its express terms, which the evidence indicates to be likely.

It is argued that inclusion of the labor provisions makes the agreement immune from attack under the antitrust laws. The stitching contractor, although he furnishes chiefly labor, also utilizes the labor through machines and has his rentals, capital costs, overhead and profits. He

is an *entrepreneur,* not a laborer. *Cf. Columbia River Packers Association* v. *Hinton,* 315 U. S. 143. The labor provisions were incorporated into the second proposal after the first was rejected as violating the antitrust laws and seem to give nothing to labor that it was not already getting for itself from other as well as from these manufacturers. The restraints here went beyond limiting work to Union shops; it limited it to those Union shops also members of the Association. The trial court found no evidence that the Union participated in making the agreement. And if it did, benefits to organized labor cannot be utilized as a cat's-paw to pull employers' chestnuts out of the antitrust fires. *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797.

The trial court appears to have dismissed the case chiefly on the ground that the accused Association and its members were not themselves engaged in interstate commerce. This may or may not be the nature of their operation considered alone, but it does not matter. Restraints, to be effective, do not have to be applied all along the line of movement of interstate commerce. The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.

The manifest purpose and intent of the contract in question was to restrain the jobbers from free choice among stitching contractors on equal terms. The business affected by the restraint is interstate commerce. The volume affected is substantial. While the restraint of the final contract is more moderate than the one first attempted and its dollar-and-cents effect on the commerce

might be difficult to appraise, it is sufficient to warrant judgment canceling the contract and enjoining carrying out of the plan it embodies.

The judgment is

*Reversed.*