Argued February 30, reargued June 13, reversed; decree rendered
June 27, 1951

# LAMBERT PHARMACAL COMPANY, a DELAWARE CORP. *v.* ROBERTS BROS., an OREGON CORP.

233 P. 2d 258

*R. R. Bullivant*, of Portland, argued the cause for appellant. On the brief were Casey, Bienecke & Chase and McNamara & Seymour, of New York City, and Freed & Failing, George E. Bronaugh, and Pendergrass, Spackman & Bullivant, of Portland.

*Stephen W. Matthieu*, of Portland, and *Everett I. Willis*, of New York City, argued the cause for respondent. With them on the brief were Root, Ballantine, Harlan, Bushby & Palmer, of New York City.

LUSK, J.

The plaintiff, Lambert Pharmacal Company, a Delaware corporation, brought this suit to obtain a decree restraining the defendant, Roberts Bros., an Oregon corporation, from selling or offering for sale any of the plaintiff's commodities which bear the trademarks or name of the plaintiff at less than the minimum resale prices established by plaintiff for its products under its fair trade contracts and notices issued pursuant thereto. The defendant conducts a retail store in Portland. A decree was entered in accordance with the prayer of the complaint and the defendant has appealed.

Plaintiff alleged in its complaint that it established such minimum resale prices pursuant to an act of Congress passed August 17, 1937, and in conformity with the Oregon Fair Trade Act, §§ 43-401 et seq., O.C.L.A. The former act, 15 U.S.C.A. § 1, known as the Miller-Tydings Amendment to the Sherman Anti-Trust Act of July 2, 1890, provides that nothing therein contained "shall render illegal contracts or agreements prescribing minimum prices for the resale" of specified commodities when "contracts or agreements of that de-

scription are lawful as applied to intrastate transactions" under local law. Before the Amendment such contracts, if they affected interstate commerce, were illegal. *Dr. Miles Medical Co. v. Parks & Sons,* 220 U.S. 373, 31 S.Ct. 376, 55 L.ed. 502. The amendment applies to any "commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others." The Oregon Fair Trade Act makes such agreements lawful (§ 43-401, O.C.L.A.) and further provides:

§ 43-402. "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 43-401, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

The defendant was not a signer of any such contract with the plaintiff, but knew of the prices which had been established by the plaintiff in its contracts with other dealers. It sold plaintiff's commodities at the stipulated prices, but with such sales gave to its customers Sperry & Hutchinson green trading stamps redeemable in merchandise and representing the right to a discount of approximately 2.08% on the purchase price. This, the plaintiff claimed and defendant denied, was a price-cutting device. And it was on that issue, together with the issue whether plaintiff was damaged and therefore entitled to injunctive relief, and a subordinate question of estoppel, that the case was tried and decided in the court below. These also

were the only issues presented in the original briefs filed in this court and on the oral argument. It was assumed by everyone concerned that the provisions of the Miller-Tydings Amendment applied to a nonsigner who had knowledge of the stipulated minimum resale prices, as well as to a signer. Indeed, that seems to have been the general understanding throughout the country among those who had occasion to deal with fair trade legislation. At the time that this case was originally submitted to us there were but two reported decisions upon the question, both rejecting the contention that the nonsigner provisions of state fair trade legislation are not within the Miller-Tydings Amendment. *Calamia v. Goldsmith Bros., Inc.*, 299 N.Y. 636, 795, 87 N.E. 2d 50; *Pepsodent v. Krauss Co.*, 56 F. Supp. 922. A similar decision had been rendered by the United States District Court for the Eastern District of Louisiana in the case now to be mentioned.

On May 21, 1951, while the instant case was under advisement in this court, the Supreme Court of the United States in *Schwegmann Brothers v. Calvert Distillers Corp.* and *Schwegmann Brothers v. Seagram Distillers Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.ed. 1035, held, three judges dissenting, that this was a misconception; that the Miller-Tydings Amendment only removed the taint of illegality from *contracts* or *agreements* prescribing minimum resale prices, not from efforts to force nonsigners to observe such prices; and that an attempt of two distributors of whiskey and gin to compel by injunction a New Orleans retailer, a nonsigner, to sell their products at not less than the minimum resale prices must fail because resale price maintenance by notice is a violation of the Sherman Act.

After this decision was rendered, on motion of the defendant, we ordered the filing of supplemental briefs and a reargument, directed to the effect of the Schwegmann decision on the present case.

The plaintiff contends that the court should not consider this question because it was not one of the issues on which the case was tried and decided in the court below.

■ The general rule, both in this state and in other jurisdictions, is that the parties to an appeal are restricted to the theory upon which the cause was presented or defended in the trial court. *MacVeagh v. Multnomah County*, 126 Or. 417, 424, 270 P. 502, and cases there cited. But, in the posture of this case, that rule must yield to the court's right to notice a plain error when that is essential to prevent a miscarriage of justice. *Patty v. Salem Flouring Mills Co.*, 53 Or. 350, 364, 96 P. 1106, 98 P. 521, 100 P. 298; *Trapp v. Metropolitan Life Ins. Co.*, 70 F. 2d 976, 981. And this is emphatically so when "questions of a general public nature affecting the interest of the state at large" are involved, 4 C.J.S., Appeal and Error, 485, § 242; and when to ignore the issue would be to lend the aid of a court of equity to the accomplishment of what has now been determined to be an illegal act. *Newport Construction Co. v. Porter*, 118 Or. 127, 135, 246 P. 211; *Jackson v. Baker*, 48 Or. 155, 157, 82 P. 512. Cf. *Chandler v. Hultgren*, 156 Or. 142, 145, 146, 66 P. 2d 268.

■ *Trapp v. Metropolitan Life Ins. Co.*, supra, is a closely parallel case. It was an action on a policy of life insurance in which the decision below, in favor of the insurance company, was based upon the construction placed upon a Missouri statute by the Mis-

souri Courts of Appeals, which are intermediate courts. In the trial court no issue was made of the correctness of this construction. Pending the appeal of the case to the United States Circuit Court of Appeals the Supreme Court of Missouri, the highest court of that state, rendered a decision overruling the lower state courts and placing a construction upon the statute which, if followed, would compel a reversal of the Trapp case. The Federal court, in an opinion by Sanborn, Circuit Judge, held that it was its duty to adopt the construction given by the Supreme Court of Missouri and reversed the judgment. We quote from the opinion:

"The result of the trial was due to what we must now regard as an erroneous construction of section 5741 by the Courts of Appeals of Missouri. The appellant was not at fault in failing to urge upon the court below an interpretation of section 5741 at variance with that which had been adopted by the state courts. It would, under the law as then understood, have been futile for her to have done so. It is now clearly apparent, however, that a wrong result was reached, and that an affirmance would make final a judgment which we now know cannot be justified under the law.

&ast; &ast; &ast; &ast; &ast;

"In A. Santaella & Co. v. Otto F. Lange Co. (C.C.A. 8) supra, 155 F. 719, 724, this court said:

"'That counsel does not fully recognize and urge a principle of law in argument which is embraced within the pleadings or presented in the record cannot preclude the court from giving due consideration and application to a rule of law which is determinative of the controversy. Indeed, an appellate court would fail to heed the wholesome maxim, "Interest reipublicae ut sit finis litium," should it fail to take notice, when reasonably pre-

sented, of a settled principle of law the application of which ends the litigation.'

* * * * *

"In United States v. The Schooner Peggy, 1 Cranch, 103, the Supreme Court said at page 110, 2 L.Ed. 49:

" 'It is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.'

* * * * *

"The record made in the court below contains all of the facts essential to a correct determination of this controversy. * * *

"We regard this case as an exceptional one and analogous to those in which a change of the law after trial has required a reversal of a judgment right when rendered. We have no intention of departing from the general rule that this court will not review questions not presented to nor passed upon by the lower court, but we think it is our duty to recognize the changed situation and 'to give effect to a matter arising since its judgment, and bearing directly upon the right disposition of the case.' Gulf, Colorado & Santa Fe Ry. Co. v. Dennis, supra, 224 U.S. 503, 507, 32 S.Ct. 542, 543, 56 L.Ed. 860."

See, also, *Spexarth v. Sherman*, 93 Or. 254, 183 P. 23; *Watts, Watts & Co. v. Unione Austriaca &c*, 248 U.S. 9, 21, 39 S.Ct. 1, 63 L.ed. 100; Annotation, 111 A.L.R. 1317, 1342.

If the record here discloses that the transactions involved affect interstate commerce, then, in view of the decision in the Schwegmann case, it would become manifest that a wrong result was reached in the Circuit Court and that an affirmance would make final

a decree which could not be justified under the law. Not only that, but it would make final a decree sanctioning an arrangement which "no court would enforce." *Schwegmann Brothers v. Calvert Distillers Corp.,* supra.

■ The case is, therefore, an exceptional one, not governed by the general rule as to the scope of review by an appellate court, and we conceive it to be our duty to examine the record for the purpose of determining whether or not the plaintiff's price-fixing arrangement affects interstate commerce, and is, therefore, illegal as determined in the Schwegmann case.

The following facts, alleged in plaintiff's complaint, are admitted in the answer:

■ Plaintiff is a Delaware corporation with a principal office in Wilmington and an office and place of business in St. Louis, Missouri. It is engaged in the business of selling and distributing in commerce certain pharmaceutical and toilet preparations bearing the trade name "Listerine". Its commodities are sold by retailers in large quantities in the United States and in the state of Oregon, the average of its annual sales throughout the United States being 12 or 13 million dollars. Its sales in Oregon represent a sizable and substantial sum. During the 10 years immediately preceding the filing of the complaint plaintiff expended some millions of dollars in advertising its products to the distributing trade and the consuming public through magazines, newspapers and other sources. It has created and developed a nationwide good will and demand for its products bearing the name "Listerine". Pursuant to an act of Congress passed August 17, 1937 (the Miller-Tydings Amendment) and in conformity with the Oregon Fair Trade Act, it entered

into contracts with a large number of store owners and retailers doing business in the state of Oregon in order to protect its good will against price-cutting in the sale of its products. These contracts became effective at plaintiff's place of business in St. Louis, Missouri. They are resale price maintenance agreements. Plaintiff gave notice of the minimum prices fixed in these agreements to the trade generally by mail, including the defendant.

The evidence demonstrates that not only the general business but the price maintenance arrangement of the plaintiff is nationwide in scope. A concession in plaintiff's brief makes certain what could be implied from the complaint and some of the evidence, namely, that the plaintiff "ships supplies of its products from its manufacturing plant in St. Louis." It has been the plaintiff's policy ever since the first Fair Trade acts were passed to be under Fair Trade contracts.*

This policy was evidently adopted because, as Mr. Hal Starrett, plaintiff's assistant general sales manager assigned to the Pacific Coast, testified, its business was nearly ruined by price-cutting in the twenties and thirties, and it was only when it was able to stabilize the price of its products that this situation was improved. When a change in price is made three signed contracts are obtained in every state in the United States and every retail druggists association in the United States is notified. A list of changes in price is kept in the St. Louis office. When one such price change was made it was publicized to the trade generally in the plaintiff's national advertising. A

---

* The first act was passed in California in 1931, Cal. Stat. 1931, c. 278. The Oregon act was passed in 1935, Laws 1935, c. 295, and amended in 1937, Laws 1937, c. 113. Forty-five states altogether have adopted Fair Trade acts.

price for a combination of a Prophylactic tooth brush and a tube of Listerine tooth paste was agreed upon at a conference in New York between plaintiff's sales manager and the sales manager of the Prophylactic Brush Company, and notice given to the trade in national magazines. Trade circulars emanating from St. Louis are in the record giving information about minimum prices and the policy of the plaintiff to enforce compliance by dealers with the Fair Trade Act. Mr. Starrett had had experience in California and the Detroit-Cleveland area with price-cutting. His attention was called to the defendant's practice of giving trading stamps with sales of plaintiff's products by the secretary of the Portland Retail Druggists Association; he reported it to the plaintiff's St. Louis office; subsequently the New York attorneys of the plaintiff wrote defendant advising it that unless it complied with the Oregon Fair Trade Act plaintiff would institute proceedings; Mr. Starrett wrote defendant a letter of like import from St. Louis. Most of plaintiff's selling to retailers is done through wholesale druggists or other distributors.

The Sherman Act, so far as material, provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.

It is settled by the decisions of the Supreme Court of the United States that with reference to commercial trade restraints such as those in question, "Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied; it 'exercised all the power it possessed.' *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 495." *United States v. Frankfort Distilleries, Inc.,* 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.ed. 951;

*Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.ed. 1204; *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.ed. 1440. See *Pevely Dairy Co. v. United States,* 178 F.2d 363 (8th Cir. 1949):

And it is enough to bring the transactions complained of within the scope of the Sherman Act that they substantially affect interstate commerce. *United States v. Frankfort Distilleries, Inc.,* supra; *United States v. Women's Sportswear Ass'n,* 336 U.S. 460, 69 S.Ct. 714, 93 L.ed. 805; *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.ed. 1328.

■ Nor does the fact that price-fixing or price maintenance applies only to intrastate retail sales remove the conduct from the reach of the statute if such conduct be "an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states." *United States v. Frankfort Distilleries, Inc.,* supra, 324 U.S. at 297. "In view of this evolution [in the interpretation of the Sherman Act], the inquiry whether the restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented. For, given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence. If so, the restraint must fall  *  *  *." *Mandeville Island*

*Farms, Inc. v. American Crystal Sugar Co.,* supra, 334 U.S. at 234. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Ass'n,* supra, 336 U.S. at 464.

Except for the Schwegmann case, we need not stop to examine how these principles have been applied to particular transactions in the numerous decisions of the Supreme Court and the lower Federal courts which have been called to our attention by counsel for the defendant; for the Schwegmann case itself controls the decision here. In the United States Court of Appeals the Distillers Corporations asserted "that the sales sought to be enjoined were wholly intrastate sales, therefore beyond the reach of the Sherman Act." The court rejected this contention, saying:

"They admit: That each plaintiff operates on a nation wide scope and functions in interstate commerce; that each uses the mails interstate and functions in some respects from headquarters in New York in formulating the minimum price schedules under the fair trade contracts with various retailers in the several states having such statutes and in giving notice of these contracts and price schedules to all retailers in the state; and that the liquors which each plaintiff sells to Louisiana wholesalers are shipped in interstate commerce from points outside Louisiana to the purchaser in Louisiana following such sales.

"They insist, however: that the reselling activities regulated by the injunctions herein represent the second intrastate transaction in the sequence of events following the movement of these liquors into Louisiana in interstate commerce pursuant to sales made by the distributors to Louisiana wholesalers; that these wholesalers then sell intrastate to retailers; and that these in turn sell intrastate to their customers.

"Appellants, on their parts, point to the facts: that plaintiffs have expressly invoked the Miller-Tydings Act; that they have expressly alleged a plan of general interstate operation and activity, in control of price and restraint of trade; that they have tried the case below on the theory that interstate commerce was affected; and that they have, without distinction between interstate and intrastate sales, sought and obtained an injunction whose purpose and effect is to maintain the pattern of restraints on commerce between the states which the plan was designed to, and does, make effective.

"Citing in their support Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, and United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951, they urge upon us that appellees in thus focusing here on the particular sales made by appellants, have not only abandoned the theory on which the suit was brought and tried but have completely missed the point of decision in the Miles case, supra, 220 U.S. at page 400, 31 S.Ct. at page 381:

" 'That these agreements restrain trade is obvious. That, having been made, as the bill alleges, with "most of the jobbers and wholesale druggists and a majority of the retail druggists of the country", and having for their purpose the control of the entire trade, they relate directly to interstate as well as intrastate trade, and operate to restrain trade or commerce among the several states, is also clear.' "

In the Supreme Court the matter was disposed of by a bare reference to "this interstate marketing arrangement." None of the dissenting judges dissented on the ground that the transactions were not interstate or not illegal under the Sherman Act if they were not rendered immune by the Miller-Tydings Amendment. As to that phase of the case, the decision is an authori-

tative and unanimous holding that the transactions did affect interstate commerce.

In no substantial particular can the course of business in the Schwegmann case and that in the instant case be differentiated so far as the present question is concerned, even in the particular that the plaintiffs in both cases invoked the Miller-Tydings Amendment.

In the plaintiff's brief it is said that, if the issue of interstate commerce had been raised below, the plaintiff's evidence would have established that it is engaged in Oregon in the intrastate sale of its products. It enumerates certain facts which it would have shown, as follows:

"(a) the Plaintiff maintains a warehouse in Oregon (in Portland) to which it ships supplies of its products from its manufacturing plant in St. Louis;

"(b) such shipments to the Portland warehouse are not made in response to the orders of particular customers, or to fulfill pre-existing contracts, but are made in quantities sufficient to maintain the warehouse stocks at a level adequate at all times to meet the anticipated demands of the trade in the entire State of Oregon;

"(c) at all times prior to sale and delivery to Oregon purchasers, title to the stocks of goods in the Portland warehouse is in the Plaintiff and such goods are at the Plaintiff's sole risk;

"(d) the Plaintiff has a full-time resident salesman in Portland;

"(e) the Plaintiff has regularly paid Oregon corporation excise taxes for the privilege of doing business in Oregon;

"(f) Oregon personal property taxes are regularly paid by the Plaintiff on the stocks of goods maintained by it in the Portland warehouse;

"(g) all orders for the Plaintiff's products in the regular course of business by Oregon customers, whether wholesalers or retailers, are received, accepted and filled in Oregon from the stocks in the Portland warehouse;

"(h) no approval of such orders by the Plaintiff's St. Louis office, or at any other place outside of Oregon, is required or obtained; and

"(i) no goods are shipped by the Plaintiff to Oregon customers from outside the State."

■ Were all these things in the record before us it would make no difference in the decision. For the fact, if it be such, that some part of the plaintiff's business is transacted locally, does not in the slightest degree lessen the effect of its nation-wide price-fixing program, initiated in Missouri and carried through in part in New York, upon the interstate commerce in which it is engaged on a large scale.

■ The suggestion of the plaintiff that we modify the decree by the addition of a proviso expressly confining its operation to intrastate commerce cannot be followed. That would be a decision *in vacuo*. And "intrastate acts will be enjoined whenever necessary or appropriate for the protection of interstate commerce against any restraint denounced by the Act." *Local 167 v. United States,* 291 U.S. 293, 299-300, 54 S.Ct. 396, 78 L.ed. 804.

We intimate no opinion upon the questions originally presented and argued.

■ We hold, on the authority of the Schwegmann case, that the plaintiff's price resale maintenance activities are illegal *per se*. The decree of the Circuit Court was, therefore, erroneous, and must be reversed and the suit dismissed. Neither party will recover costs and disbursements.