217 F.2d 148
 Charles L. LAWSON and Herbert M. Lawson, Partners doing
business under the firm name of Lawson Vault
Company, Appellants,
v.
WOODMERE, Inc., a corporation, Ridgelawn Cemetery
Association, a corporation, Huntington Vault
Company, a corporation, Harry S. Shivel,
and Robert M. Bagby, Appellees.
 No. 6831.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 7, 1954.
Decided Nov. 9, 1954.
 
 Thomas W. Harvey, Huntington, W. Va., for appellants.
 Luther E. Woods, Jr., Huntington, W. Va. (Campbell, McNeer & Woods, C. F. Bagley, Jr., Huntington, W. Va., on brier), for appellees.
 Before PARKER, Chief Judge, DOBIE, Circuit Judge, and HOFFMAN, district judge.
 DOBIE, Circuit Judge.
 
 
 1
 Charles L. Lawson and Herbert M. Lawson instituted, in the United States District Court for the Southern District of West Virginia, a civil action against Woodmere, Incorporated, Ridgelawn Cemetery Association, Huntington Vault Company and Harry S. Shivel and Robert M. Bagby, seeking damages and injunctive relief under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 2, 15. The District Court denied the motion of plaintiffs for summary judgment and granted the motion of defendants to dismiss, on the score that there is no interstate commerce involved within the meaning of the Sherman Anti-Trust Act, 120 F.Supp. 267. Plaintiffs have appealed to us. We think the judgment of the District Judge was quite correct and we must, therefore, affirm it.
 
 
 2
 Plaintiffs, as partners, carried on, in Huntington, West Virginia, the business of manufacturing and selling concrete burial boxes and concrete burial vaults. They also sold metal burial vaults. These metal vaults, and some of the materials used in the construction of the concrete boxes and concrete vaults, were bought outside of West Virginia. All the boxes and vaults, until they were sold, were stored at Huntington in the warehouse of plaintiffs. On rare occasions, plaintiffs ordered a special metal vault for a customer which, upon its receipt by plaintiffs, was delivered directly for the use of the customer.
 
 
 3
 Woodmere and Ridgelawn are West Virginia corporations, each operating a cemetery in Cabell County, West Virginia. The stock of Ridgelawn is owned by Woodmere. These two corporations have the same officers, the defendants, Shivel and Bagby. The defendant, Huntington Vault Company, is a West Virginia corporation organized by Shivel and Bagby to engage in the vault business. Vault companies, it seems, would not sell direct to cemeteries. The stock of Huntington Vault Company is owned, in equal amounts, by Shivel and Bagby. It purchases its vaults outside the state and stores them on the property of Woodmere and Ridgelawn cemeteries until they are used. All three of these corporations have the same officers and maintain headquarters in the same building. The Vault Company has been deemed an integral part of the business conducted by Woodmere and Ridgelawn.
 
 
 4
 In October, 1950, Woodmere and Ridgelawn notified all vault companies and undertakers that all vaults to be used in these cemeteries would be installed by Woodmere and Ridgelawn; that all vaults would have to be delivered at least four hours before the funeral ceremony; and that the vault companies would be charged an installation fee of $25.00, payable before the installation of the vault.
 
 
 5
 In November, 1952, Woodmere and Ridgelawn entered into a contract with Huntington Vault Company under the terms of which the Vault Company took over the installation of all vaults in Woodmere and Ridgelawn, according to the rules and regulations prescribed by the two cemeteries. By this contract the Vault Company was given the right to charge a fee for each installation, provided the fee did not exceed $25.00.
 
 
 6
 The arrangements and practices between the defendants under these contracts are attacked by plaintiffs as being violative of the Sherman Anti-Trust Act. Accordingly, plaintkffs, in their complaint, sought treble damages, an injunction against the defendants and such other relief as might be proper and just.
 
 
 7
 It might be noted that Huntington Vault Company had, under the agreements in question, no exclusive right to sell the vaults which were to be installed in Woodmere and Ridgelawn cemeteries. Indeed, the principal supplier of these vaults has been the Tri-State Vault Company, an independent concern, as to which the defendants exercise neither ownership nor control. At no time has Huntington Vault Company acquired a major part of this vault business and its sales of vaults have shown a decrease.
 
 
 8
 We come first to the contention of plaintiffs that interstate commerce under the Sherman Act is here involved because plaintiffs import from without West Virginia some of the materials which they use in the manufacture of their burial boxes and vaults. This contention seems to be quite lacking in merit. Certainly, it finds little or no support in the decided cases.
 
 
 9
 Thus, in Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99, 103, Circuit Judge Stephens said:
 
 
 10
 'The concentrate, a principal ingredient of the completed article of commerce, was shipped from New York to warehouse in Pennsylvania, where the article of trade was compounded and packaged. Did the interstate movement of the concentrate end when the ten-gallon containers of concentrate were received at Cloverdale Spring Company's plant; or did it, in its transition with other substances into a bottled and labeled beverage sold to the trade, continue in the flow of interstate commerce? We are of the opinion that the interstate movement ended with the containers resting in Cloverdale's warehouse.'
 
 
 11
 Again, from the opinion of Circuit Judge Allen in Ewing-Von Allmen Dairy Co. v. C. and C. Ice Cream Co., 6 Cir., 109 F.2d 898, 900, certiorari denied 312 U.S. 689, 61 S.Ct. 618, 85 L.Ed. 1126:
 
 
 12
 'We do not regard the transactions complained of as creating a direct and substantial burden on interstate commerce. The ingredients which came from without the state ceased to be a part of interstate commerce when manufactured and sold in Kentucky. The sales in appellants' retail stores were entirely of a local nature, made after all transportation, local and interstate, had ceased, and were beyond the regulatory power of Congress over interstate commerce.'
 
 
 13
 And Chief Justice Hughes, in the celebrated case of Schechter Poultry Corporation v. United States, 295 U.S. 495, 543, 55 S.Ct. 837, 849, 79 L.Ed. 1570, stated:
 
 
 14
 'The undisputed facts thus afford no warrant for the argument that the poultry handled by defendants at their slaughterhouse markets was in a 'current' or 'flow' of interstate commerce, and was thus subject to congressional regulation. The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use. So far as the poultry here in question is concerned, the flow in interstate commerce had ceased. The poultry had come to a permanent rest within the state. It was not held, used, or sold by defendants in relation to any further transactions in interstate commerce and was not destined for transportation to other states. Hence decisions which deal with a stream of interstate commerce-- where goods come to rest within a state temporarily and are later to go forward in interstate commerce-- and with the regulations of transactions involved in that practical continuity of movement, are not applicable here.'
 
 
 15
 See, also, East Ohio Gas Co. v. Tax Commission, 283 U.S. 465, 51 S.Ct. 499, 75 L.Ed. 1171; Danciger v. Cooley, 248 U.S. 319, 39 S.Ct. 119, 63 L.Ed. 266; Walling v. Goldblatt Brothers, 7 Cir., 128 F.2d 778, 782; Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202, 207; Lipson v. Socony-Vacuum Corp., 1 Cir., 87 F.2d 265, 266.
 
 
 16
 Equally without merit is plaintiff's argument that the Sherman Anti-Trust Act may be invoked on the ground that interstate commerce is involved because some of the metal vaults sold by them in West Virginia had, at some earlier time, been brought into West Virginia from some other State. These vaults cease to be in the flow of interstate commerce, within the Sherman Anti-Trust Act, once they have come to rest in the warehouse of plaintiffs, and are there held for local sale.
 
 
 17
 In Industrial Association of San Francisco v. United States, 268 U.S. 64, 78-79, 45 S.Ct. 403, 406, 69 L.Ed. 849, Mr. Justice Sutherland stated:
 
 
 18
 'It is true, however, that plaster, in large measure produced in other states and shipped into California, was on the list; but the evidence is that the permit requirement was confined to such plaster as previously had been brought into the state and commingled with the common mass of local property, and in respect of which, therefore, the interstate movement and the interstate commercial status had ended.'
 
 
 19
 And, to quote Judge Allen again in the Ewing-Von Allmen case, supra, 109 F.2d at page 900:
 
 
 20
 'The sales in appellants' retail stores were entirely of a local nature, made after all transportation, local and interstate, had ceased, and were beyond the regulatory power of Congress over interstate commerce.'
 
 
 21
 See, also, the Schechter, Lipson and Jewel Tea cases cited, supra, and Levering & Garrigues Co. v. Morrin, 289 U.S. 10o, 53 S.Ct. 549, 77 L.Ed. 1062.
 
 
 22
 The cases cited by the plaintiffs present factual situations quite different from those in the instant case. These cases are all readily distinguishable and have no application here. We find nothing in these cases to militate against the views we have expressed. United States v. Lorain Journal, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162; Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371; United States v. Women's Sportswear Manufacturing Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805; Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.
 
 
 23
 In the classic cases of Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 648, 55 L.Ed. 663, the Supreme Court established the celebrated 'rule of reason' by holding that not all restraints of interstate commerce are within the ambit of the Sherman Anti-Trust Act, but only those restraints which are undue or unreasonable. The Act does not cover restraints that are merely incidental, casual and immaterial. The defendants here operate no public utility; they are not, in any sense, affected with a public interest. On the contrary, their activities are clearly and intensely local. Accordingly, the activities of defendants fall without the ambit of the Sherman Anti-Trust Act.
 
 
 24
 Both Ridgelawn and Woodmere is selling lots have obligated themselves to maintain their cemeteries and have created a perpetual care fund for this purpose. Of necessity the cemeteries have had to reserve the right at all times to adopt reasonable rules and regulations with respect to their maintenance. Every purchaser of a lot has made his purchase upon the understanding that the use of his lot will be subject to reasonable rules and regulations of the cemetery, and his deed contains such a provision. In the light of this duty to preserve the cemetery properties, Woodmere and Ridgelawn, we think, have the right to select the person or persons who shall perform services with respect to their properties and the right to prescribe and enforce the conditions upon which these services shall be performed.
 
 
 25
 Clearly distinguishable from the case before us are the cases cited by appellants. Thus, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, and Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, involved price-fixing on a large scale.
 
 
 26
 United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, was concerned with an admitted combination among oil companies to eliminate 'distress' gasoline as a market factor for spot market prices for gasoline by purchasing the excess production of independent refiners and thus maintaining and fixing the spot market price of gasoline. The combination involved a large majority of the prominent oil companies in the United States, and obviously affected and restrained commerce.
 
 
 27
 In Fashion Originators' Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949, the respondents had combined in an effort to prevent their customers from purchasing any dresses not manufactured by them. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, involved a contract whereby the salt company required the users of its patented machines to use its salt.
 
 
 28
 From the opinion of Judge Wilkin in the District Court, we quote this apt paragraph, with which we cordially agree:
 
 
 29
 'It seems to this Court that all the arrangements made by the cemeteries are within their rights and powers, and beyond the power of Congress to regulate or control. Certainly it would seem to be within the power of cemeteries to specify the kind of boxes and vaults that could be used, and they would seem to have the right to require that all installations be made by them, their servants or agents. It seems clear that what they could do themselves, they could contract that some one else could do, even if such regulations, contracts, or requirements should have some indirect and remote effect upon interstate commerce. The owning and managing of a cemetery is certainly intrastate business. As stated in the cases cited above, the transactions complained of can not be regarded as creating a direct and substantial burden on interstate commerce. The ingredients, which come from without the state, cease to be a part of interstate commerce when manufactured and sold in West Virginia. The sales made by the plaintiffs, except in rare instances, are local in nature, because made after interstate transportation had ceased. They are, therefore, also beyond the purview of Federal authority over interstate commerce. The arrangements complained of went no further than to require a payment of installation fee for the work which was assumed by the cemeteries or their agent. Such arrangements did not prohibit sales by the plaintiffs, and the effect of such arrangements on interstate trade, if any, was clearly incidental, indirect, and remote.' (120 F.Supp. 269.)
 
 
 30
 The judgment of the District Court is affirmed.
 
 
 31
 Affirmed.