## JOLIET CONTRACTORS ASS'N et al. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10323.

United States Court of Appeals
Seventh Circuit.

Jan. 7, 1952.

Charles M. Price, Harold D. Burgess, Charles B. Mahin, Willard C. Meier, and Leish, Spray, Price & Underwood, all of Chicago, Ill., for petitioners.

David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Norton J. Come, George J. Bott, General Counsel, Alice Andrews, Attorneys, National Labor Relations Board, all of Washington, D. C., for respondent.

Daniel D. Carmell, and Asher, Gubbins & Segall, and Lester Asher, all of Chicago, Ill., for amici curiae, Glaziers' Union Local No. 27 of Brotherhood of Painters, Decorators and Paper Hangers of America.

Before MAJOR, Chief Judge, and KERNER and FINNEGAN, Circuit Judges.

MAJOR, Chief Judge.

This is a petition filed pursuant to Section 10(f) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., to review and set aside an order of the National Labor Relations Board dismissing an unfair labor practice complaint issued upon charges filed by petitioners. The Board's decision and order are reported in 90 NLRB 542.

Petitioners are engaged in various phases of the building and construction business in Joliet, Illinois, within this Judicial Circuit. Petitioner Joliet Contractors Association (sometimes referred to as the Association) is a non-profit Illinois corporation composed of some twenty-two general contractors engaged in the construction and repair of industrial, commercial and residential buildings, and some forty-four specialty or sub-contractors. The Association also includes in its membership two glazing contractors who install glass and perform all of the glazing services in building construction in Joliet and vicinity, generally under sub-contracts with general contractors. The Association was the collective bargaining agency for all its members, including the glazing contractors. The remaining petitioners, corporations and partnerships, are lumber and building material dealers engaged in purchasing, warehousing and selling lumber and building materials, including preglazed materials, to contractors in the Joliet area.

The Board's complaint, filed October 5, 1948, was directed against Glaziers' Union, Local No. 27 of the Brotherhood of Painters, Decorators, and Paper Hangers of America (hereinafter referred to as the Union) and its agents, George H. Meyers and John R. Hoffman. It alleged violations of Sec. 8(b)(1)(A) (Union restraint of employees' rights to organize and bar-

gain collectively) and Sec. 8(b)(4)(A) (secondary boycott) of the Act.

Pursuant to Sec. 10(l) of the Act, the Board, on September 9, 1948, petitioned the United States District Court for the Northern District of Illinois for an injunction against continuance of the Union's secondary boycott, pending final adjudication of the Board. The court, after hearing, granted the injunction.

The case was heard by a Trial·Examiner for the Board in December, 1948, and January, 1949, and on July 18, 1949, the Trial Examiner filed an intermediate report which contained detailed findings relative to the activities and conduct of the respective parties. Predicated thereon, the Examiner concluded that the Union and its agent Meyers had engaged in unfair labor practices within the meaning of Sec. 8(b)(4)(A) of the Act, and that such unfair labor practices affected commerce within the meaning of Sec. 2(6) and (7) of the Act. The Examiner exonerated the Union's agent Hoffman from all charges and the Union on the charges predicated upon Sec. 8(b)(1)(A) of the Act. The Examiner recommended issuance of an order by the Board directing that the Union and Meyers, its business agent, "Cease and desist from engaging in, or inducing or encouraging the members of Local No. 27 to engage in, a strike or a concerted refusal in the course of their employment to perform services for any employer, where an object thereof is to require their employer or any other employer or other person to cease doing business with any member of the Joliet Contractors Association, or any other employer who uses or sells preglazed sash, or has used or sold preglazed sash."

On June 26, 1950, the Board dismissed the complaint and in its decision stated, "We find merit in the Respondents' contention that because the operations of the Employers involved herein are essentially local in character, the Board, in the exercise of its discretion, should decline to assert jurisdiction," and "we find that it would not effectuate the purposes or policies of the Act to exercise jurisdiction in this proceeding." Motions for reconsider-

ation of the Board's order of dismissal, filed by its General Counsel and by the petitioners (charging parties before the Board), were denied by the Board.

The contested issues before this court, as stated in the Board's brief, are:

"1. Whether, in cases involving the building and construction industry, the Board has the discretionary authority, which it has in all other cases, to decline jurisdiction where the impact of the dispute on commerce is relatively insubstantial.

"2. Assuming that question '1' is answered in the affirmative, whether the Board properly exercised this discretionary authority here."

Petitioners do not seriously challenge the contested issues, thus stated, although they do argue that Congress by the amended Act of 1947 gave the Board a clear mandate to hear and determine all secondary boycott charges in the building industry. In any event, it is contended that the Board's discretion, if any, is of an extremely limited nature. In the view which we take of the situation, it will not be necessary for us to reach petitioners' contention in this respect.

Assuming that the contested issues as stated by the Board are correct, we think they fall short of reaching the basic issue for our determination. More specifically, assuming that the Board has the discretionary authority "to decline jurisdiction where the impact of the dispute on commerce is relatively insubstantial," the more basic issue is whether the Board employed a correct yardstick or standard in evaluating such impact. And whether the Board properly exercised its discretionary authority in turn depends upon a solution of this issue.

There is no dispute as to the facts as found by the Trial Examiner and as disclosed by the record. As shown, the Board in dismissing the complaint took no issue with the Trial Examiner as to the facts. Thus, the Board's dismissal raises legal rather than factual considerations.

In view of the situation so far related, it appears material to relate the facts insofar as they bear upon the impact on commerce resulting from the activities of the Union, admittedly a secondary boycott in violation of the Act. The membership of the Union is composed of men who glaze windows, doors and other building materials—they put in the glass. It includes within its jurisdiction the entire metropolitan Chicago area, including the Joliet area. The Joliet Glass and Paint Company and the Porter Glass Company, members of the Joliet Contractors Association, employ only members of the Union. The latter operates a hiring hall which the glazing contractors in the Chicago metropolitan area (including Joliet) call when they need men. Long prior to the enactment of the amended Act of 1947, the Union did not permit any of its members to work on projects that used preglazed building material. The glazing of windows, doors, storm sash and other parts of a building can be done at the site of the construction or at the factory where the particular building material is manufactured. When done at the factory, it is called preglazed or mill glazed. Contractors in the Joliet area had in the past used large quantities of building materials which had been preglazed at the factory.

The Union had in effect for many years certain "by-laws and working rules" which required that all preglazed work must be done at the site of construction. Article XVI reads, "All sash and glazing work must be done on each respective job site or building." The by-laws require an agreement between the contractor and the Union that all glass and glazing work which the contractor undertakes "shall be glazed on each respective job by members" of the Union. Article VI, Sec. 8, of the by-laws provides, " * * * the business agent shall supervise all jobs where glazing is done within the jurisdiction of Local No. 27 and enforce conditions of the agreement in all shops and on all jobs." Article IV, Sec. 5, providing for the use of a Union label, reads, "This label shall be for the use of all the members in good standing, and any member wilfully refusing to use this label or using it on sash glazed on unfair jobs or for any unfair glazing contractor, or who shall loan or give or sell to any-

one, not a member of this local, or connive for the fraudulent use of the label, shall be expelled from the union without further notice."

The. president of the Union testified, "there is no preglazed sash used on any union job because we object to it," and "preglazed sash never enters into the job that I know of when our men are there because we have a rule against the use of preglazed sash." He also testified, "And it is the obligation of the contractors under the contract, and also the obligation of the members, not to do any work on the job where glazing is not done on the job. * * If a member violates that provision he is subject to disciplinary action."

A business agent of the Union testified that if they found sash on a job which did not bear the Union label, it was classified as an unfair job and that every day members of the Union leave jobs and refuse to work because the jobs do not conform to the Union rules either because the sash was glazed at the mill or glazed on the job by someone other than a member of the Union. When the general contractor refuses to go along, the glaziers stay away from the job.

The Union is affiliated with the Building Trades Council in Chicago and also with other councils in its jurisdictional area, including that in Joliet. The building trades affiliated with the Building Trades Councils in the various cities report to the Union jobs on which the glazing is not done on the site. One of the purposes of the Union's affiliations with the Building Trades Council is that the other trade unions will support the Union in enforcing its rules even to the extent of work stoppages by other crafts.

The Union rules against preglazed building material have been enforced in the City of Chicago for many years, with the result that such materials are not used in that area. It was not until 1947, however, that the Union attempted to enforce its boycott rules in the Joliet construction area. It was this attempt which marked the inception of a series of events shown in the instant controversy.

Early in January, 1947, the Joliet glazier stewards were called into the Union office in Chicago and told that from that time on they would have to live up to the Union rules 100% and that they could not do any glazing on jobs where there was any preglazed sash. In January, 1947, Paul G. O'Neill, the largest general contractor in Joliet, was constructing fifty G.I. homes, involving an investment of $300,000. Part of these houses had wood preglazed sash installed, and others had open metal sash to be glazed on the job. Union glaziers, employees of glazing contractor George Hacker, who were engaged to glaze the metal open sash, saw that some other houses had preglazed sash installed. They stopped work, called the Union vice president, Max Glass, in Chicago, and were directed to cease work until all preglazed sash was removed and new open sash installed on the whole project. Contractor O'Neill followed this direction at substantial expense, and the entire project then was glazed by the Union glaziers. Since that time O'Neill has used only open sash. He testified that his large investment did not permit the chance of further work stoppage of this type and that he would still be using the more economical preglazed sash except for the Union rule.

On March 7, 1947 and following the O'Neill work stoppage, a committee of the petitioner Association met with the Joliet Building Trades Council, the Glaziers' Union, and the glazing contractors. Mr. Max Glass, Chicago vice president of the Glaziers' Union, stated that "they had attempted to eliminate the use of preglazed sash in the Joliet Area for some time, and that the time had come when they were definitely going to eliminate it." He said that "they were going to enforce that if it was necessary to police the area." At that meeting, general contractor Joseph Girard asked Union vice president Glass what could be done about a twenty-five home project on which he had placed an order for preglazed sash. Glass told him he could use preglazed sash on that job only if he paid the Union one day's glazier's pay ($17.50) cash for each of the twenty-five houses.

The contractors continued to resist the attempted ban on preglazed sash, and in June, 1947, John R. Hoffman, the Joliet business agent of the Painters Local No. 33 (affiliated with the same International as Glaziers' Union herein), arranged a meeting in Chicago with George H. Meyers (now deceased), business agent and chief executive of the Glaziers' Union. Mr. Rositch, president of Joliet Building Trades Council, and Mr. Orbison, business representative of the carpenters, Mr. Max Glass and Joliet contractors Arnold Welsch, Joseph Girard and Roy Ice were present. The contractors protested the Union ban on preglazed sash, but they were told that they would definitely have to live up to those rules in Joliet if they were to get Union glaziers. Mr. Meyers gave contractor Welsch a copy of the Union form of agreement with contractors, which contained the provision that all glazing work should be done on the job. At that meeting the Joliet contractors were told: "* * * Mr. Glass, or Mr. Meyers told us that that condition was being enforced in Chicago, and that we would definitely have to live up to those rules in Joliet if we were to get union glaziers, and that we would have to pay traveling time and traveling expense, and that we would definitely have to cease using preglazed or mill glazed windows."

In November, 1947, the Union glaziers refused to install plate glass on the Remiens Laboratory job because the owner had replaced some other glass over the years which had been broken out by children. Union agent, George Meyers, required that all glass be removed and reinstalled by Union glaziers before the plate glass could be set.

In November, 1947, George Hacker agreed to do the store-front glazing on the Reliable Poultry Company brick construction job on which Magnus T. Strandberg was general contractor. Hoffman refused to permit glaziers to work, because Strandberg would not sign the contract banning preglazed sash. Strandberg had been using preglazed sash.

This occurrence resulted in a meeting later in November, 1947, at the Building Trades Council in Joliet attended by representatives of the Contractors Association, including Strandberg and glazing contractor Hacker, with Hoffman, the Union business agent. At that meeting which was called by Strandberg, Hoffman reiterated that he would not let Strandberg have glaziers on the job because he had been using preglazed windows and had not agreed to stop using them. At that meeting Hoffman insisted that all of the contractors, including the glazier contractor, sign a contract with the Union containing a provision not to use any preglazed sash in Joliet, saying, "I cannot let you have men unless you agree to go along with the contract."

Thereafter, on November 19, 1947, the Joliet Contractors Association wrote the Union summarizing the demands of the Union, calling attention to the fact that the refusal of the Union to permit their members to work on jobs where preglazed materials were used amounted to a boycott and a threat to tie up all construction jobs in Joliet unless the demands were met. The letter set forth the position of the Contractors Association, including its glazing contractor members. It offered to bargain for a contract for the local glazing contractors on the basis that they would be able to do work on jobs in Joliet regardless of whether or not there was some preglazed sash on the job. Hoffman testified that that letter stated the substance of the discussion at the meeting in November, 1947. This letter was not replied to by Hoffman.

At or about this same time in November, 1947, George Meyers called George Hacker and told him to tell his brothers who were operating the Hacker-Sime Lumber Company (petitioners herein) to stop selling preglazed sash and to stop glazing steel sash at night. Meyers threatened to picket Hacker-Sime and to refuse to supply George Hacker with glaziers.

On January 5, 1948, Hoffman, representing the Glaziers' Union, sent the Association a letter asserting exclusive glazing jurisdiction in the Union, stating that all glazing must be done on the job, and "Glaziers Local 27 will be unable to furnish

union glaziers to non-signatories of this agreement after the above mentioned date."

Commencing in January, 1948, the Union evolved a system of listing and designating all of the contractors as "fair" or "unfair," depending on whether or not they used preglazed sash. Contractor O'Neill, who agreed to cease the use of preglazed material for the reason heretofore stated, was placed on the "fair" list. Contractors Welsch, Swenson, Bockholdt and Mazzucco were also cleared. Later, another Union list was prepared on which certain contractors were designated as "fair" because they had agreed not to use preglazed sash.

During the first months of 1948, numerous meetings were held between committees representing the petitioners and those representing the Union in an effort to settle the controversy. The stumbling block to reaching an agreement was that both sides were adamant in their position with reference to the use of preglazed material.

We think it not necessary to relate the numerous incidents which took place in the year 1948, when the Union's rules or demands were enforced. They follow a pattern similar to those to which we have referred. They clearly reveal the stranglehold which the Union had upon the building industry in the Joliet area, and this situation continued until the District Court issued its injunction late in 1948.

As bearing upon the commerce question, we think it pertinent to note a stipulation entered into at the hearing before the Trial Examiner, wherein it was recited in part:

"It has been agreed that with respect to those general contractors named, all of them have their glazing work done by the Joliet Glass & Paint Company and the Porter Glass Company, who also supply the glass. The glass is delivered to the general contractor's job from the glazing contractor's shop within the state, but originated outside of the state, there being no such glass manufacturer in the State of Illinois.

"The glass is purchased by the glazing contractors within the state, and is delivered to them from warehouses within the state, except to the extent testified to by George Hacker as to a direct shipment from out of the state amounting to about $4,000 yearly. That shipment, of course, was with regard to the Joliet Glass & Paint Company.

"It is further stipulated between us that all of the preglazed sash is purchased by the general contractors from the nine Joliet lumber companies who are charging parties in this case, and is delivered by the lumber companies from their local plants to the general contractors. * * *

"Approximately half of such pre-glazed sash originated outside of the State of Illinois, and the remainder was assembled within the state of materials, glass, frames and open sash, all of which originated outside of the State of Illinois.

"It is further stipulated that the general contractors cannot complete their construction of buildings without the installation of glass; that the delay in the installation of glass causes delay in the completion of the structures; that certain trades or artisans will not work on the structures after November until the glass is installed, such as lathers, plasterers, painters, plumbers and electricians. * * *

"It is also stipulated that by reason of the refusal of the union glaziers to work on jobs where pre-glazed sash is installed, the general contractors have had to elect to use pre-glazed sash and forego the use of union glaziers, or to use the union glaziers and forego the use of pre-glazed sash."

In connection with this stipulation, there was received before the Trial Examiner by agreement two exhibits, designated Appendix B and Appendix C, the former relating to the Joliet contractors and the latter to the Joliet lumber and building material dealers. We think it unnecessary to set forth Appendix B and Appendix C in detail. The former discloses the total construction business of the contractors therein named for a twelve-month period, in an amount of $2,997,370, that materials purchased by said contractors amounted to $1,357,468, that materials which originated out of the state amounted to $1,004,870, and that materials received directly from out of state amounted to $86,404. This exhibit shows that Paul G. O'Neill, the largest con-

tractor, purchased material in the amount of $275,000, of which $247,500 originated out of state and $27,500 was received by him directly from out of state. Contractor Arnold Welsch purchased materials in the amount of $145,000, of which $101,500 originated out of state and $13,000 was received by him directly from out of state. Contractor Hansen and Peterson Company purchased material in the amount of $153,800, of which $99,970 originated from without the state and $12,304 was received by it directly from out of state. These are shown to have been the three largest contractors as to material purchased, both that originating and that received directly from out of state. Appendix C lists seven building and material dealers, and shows that the building materials purchased by them amounted to $1,664,025. They purchased materials from out of the state in the amount of $1,293,430. Purchases shipped directly from out of the state amounted to $1,031,705. These dealers purchased preglazed materials in the amount of $149,779, purchased preglazed materials originating out of the state in the amount of $126,224, and preglazed materials shipped directly from out of the state in the amount of $24,678.

The Board exercised its asserted discretionary authority to dismiss the complaint for the reason that the impact on commerce produced by the Union activities was insubstantial. In reaching this result, the Board considered only the amount of preglazed material received directly from out of the state by each of the contractors. In its brief the Board states: "In sum, this case, in the Board's view, boiled down to a series of separate disputes, each involving a general contractor as the primary target, and a glazing subcontractor as the secondary target. In each dispute, both the primary and secondary employer was engaged in a purely local business, which affected commerce primarily because of 'indirect' purchases of materials. This type of impact on commerce the Board had previously concluded was too indirect and insubstantial to warrant the exercise of jurisdiction."

And at another point in its brief, in explaining its position the Board states: "That is, the operations would be considered separately rather than all together, for purposes of determining whether the Board would, as a matter of policy, assert jurisdiction. So viewed, the situation was just as though a number of separate charges had been filed with the Board, each involving a different general contractor as the primary target of the Union's action."

In our judgment, the reasoning thus employed by the Board ignores the realities of the situation both as to the objective sought to be accomplished by the Union and the result, which it achieved in part only, because it was enjoined by the District Court and which, if the Board's order is permitted to stand, it will be free to pursue until there is no preglazed material used in the construction industry in the Joliet area. That such a result is not left to speculation or guess is shown by the Union's edict contained in its by-laws and by the provision which it requires to be inserted in every bargaining agreement. This same Union has achieved this result in the Chicago area and there is no reason to doubt but that it will in the absence of restraint do likewise in the Joliet area. Its target is not directed at general contractors separately, as the Board argues, but at all business—general contractors, sub-contractors and dealers in material and supplies. More specifically, it is directed at the use of preglazed material in the building and construction industry in the Joliet area. And the fact that the victims of this illegal practice are picked off one at a time, or that some of them accede to the Union's demands, does not dispel the irresistible conclusion that they are collectively the target of the Union activities. We disagree with the Board's reasoning that the fact that some of the contractors acceded to the Union demands demonstrates an absence of any common Association policy and that resolution of the dispute must rest upon an individual basis. The fact is that they were all driven into the same corner and thereby had a common interest. That some resisted the Union demands and that

others surrendered because they could not resist the pressure for economic or other reasons does not minimize the objective sought to be accomplished or dispel the illegal challenge with which they were confronted by reason of the boycott imposed on the building and construction industry in the Joliet area.

We think the totality of the situation must be considered, both that which has resulted from the boycott as well as that which is likely to result, in measuring the commerce impact, rather than merely viewing the activities of each individual as the Board has done.

The Board's reasoning disregards the real effect of a secondary boycott on the flow of building materials in interstate commerce. It ignores the fact that the real effect of a secondary boycott in the building and construction industry is the stoppage of the flow of building materials from the manufacturers to the dealers and thence to the contractors. It makes the application of the Act turn upon whether the material produced out of state moved directly to the contractor or to the contractor through the material dealer. We are unable to discern how it can be thought that commerce is not substantially "affected" merely because the contractors purchase only a small proportion of their preglazed material directly from without the state. The local dealers from whom the contractors purchase such material receive it in large volumes, as the record shows, from without the state. It is obvious that the contractors, when proscribed from using such material, will no longer purchase it from the local dealers, and it is equally obvious that the interstate business of the dealers will be impaired to that extent.

The Board attempts, however, to justify its position in eliminating from consideration the interstate business done by the material dealers on the theory that there was no dispute between the Union and such dealers—in other words, the Union was not engaged in an unfair labor practice against the dealers. We think this argument is beside the point. The question is as to the impact on commerce and not whether the dealers were the direct victims of the boycott. The Board also asserts that the majority of the sales of preglazed material made by the dealers were to persons other than contractors. Just what that proves we do not know unless it is that the Union has not fully accomplished its objective. It seems certain that all contractors will be precluded from using preglazed material and that the business of the material dealers as well as commerce will be impaired to that extent. And in all probability, if the Union is permitted to pursue its illegal objective, the sale of preglazed material in the Joliet area will become a thing of the past, as it has in the Chicago area.

Moreover, the Board gives scant, if any, consideration to the inevitable effect on commerce in building materials other than those directly involved in the practices complained of, and this notwithstanding it is shown by stipulation of the parties that which is a matter of common knowledge, that is, that when members of the Glaziers' Union refuse to work on a job, all other craftsmen do likewise, thereby resulting in a complete stoppage of work with the resultant cessation of the use of all building material. Thus the inflow of all building material is stymied, and this result is as certain where the inflow is to the contractors through the local dealers as it is where it is directly to the contractors. This situation was aptly described by the General Counsel for the Board in support of his motion for reconsideration of the decision. He stated:

"Thus, the unions in the construction industry, particularly through their Building Trades Councils, can, and frequently do, shut down a complete construction project when one of the member unions, doing only a small segment of the work, becomes involved in a labor dispute with an employer. Moreover, it is common knowledge that in the construction industry there is an interdependence between the general contractors, the subcontractors and the building material suppliers, producers, manufacturers, processors, and dealers which is so closely knit that a work stoppage anywhere along the progress of a construction project necessarily affects the operations, the production, the purchases, and the sales

of all the parties who constitute the integrated industry pattern.

"These factors emphasize the importance, with respect to the flow of interstate commerce in the building construction industry, of the small establishment and demonstrate that the prevention of serious and substantial interferences with the free flow of commerce requires effective control of unfair labor practices occurring in the small as well as the large establishments of which the industry consists.

\*  \*  \*  \*  \*  \*

"\* \* \* Moreover, certain artisans of the building trades, including lathers and plasterers, will not work in buildings in which glass has not been installed. Delay in obtaining or installing glass hinders and obstructs the completion of the construction work in which the general contractors are engaged. Such delay therefore both affects the interstate movement of other building materials and supplies and hinders and obstructs the production of goods for commerce by owners and occupants of the projected structures."

In our judgment, the reason assigned by the Board for the dismissal of the complaint finds no support in the legislative history of the 1947 amendments to the Act and particularly the provision directed at secondary boycotts in the building and construction industry, and little, if any, support in the cases upon which the Board relies. An extensive review of the legislative history as well as court decisions material to the proper yardstick to be employed in determining the impact on commerce produced by the activities in a given case would unduly prolong this opinion and would perhaps serve no useful purpose. The legislative history undoubtedly reveals that Congress was fully aware of the crippling effect on commerce produced by the secondary boycott and that this practice was widely prevalent in the building and construction industry. It is equally free from doubt that Congress intended that such practices should be eradicated.

Referring to the Congressional purpose, dissenting Board member Reynolds states: "The 80th Congress recognized that the Board always had the power to assert juris-

diction over this industry. Furthermore, Congress was fully cognizant of the Board's refusal to exercise its power in the past, but nevertheless expressed a clear mandate that such power be used in order to reach and eliminate certain practices which were considered detrimental to the public interest. In so doing, Congress was well aware not only of the peculiarly local characteristics of the industry, but also of its great impact upon interstate commerce."

Apropos of the instant situation, the dissenting member states: "It cannot be gainsaid that the operations of a considerable number of contractors in the industry are individually rather small; however, it likewise cannot be denied that the effect on commerce is very great; for in 1946 the total volume of new construction in the United States was over ten billion dollars."

In concluding, the dissenting member further states: "In view of the special concern Congress had with the building and construction industry and because of the industry's considerable and far-reaching effects on commerce, I believe that it would effectuate the policies of the Act for the Board to exercise its powers fully in asserting jurisdiction, absent a *de minimis* flow of material in commerce."

The same criteria for evaluating the effect on commerce of unfair labor practices in the building and construction industry were advanced by the Board and approved by the court in Shore, for and on Behalf of National Labor Relations Board v. Building & Construction Trades Council of Pittsburgh, Pa., 3. Cir., 173 F.2d 678, 681, 8 A.L.R.2d 731. The court stated: "All of this argument adds up to the conclusion that what affects the building industry in a given community affects interstate commerce and that the total effect of a $10,000,000,000 industry on interstate commerce is obviously very appreciable. One small stoppage may not have an immediately perceptible effect upon the flow of the whole stream. But many small stoppages will have such effect."

Pronouncements by the Supreme Court in a number of cases are persuasive that the Board employed an improper standard in measuring the impact on commerce resulting from the Union's activities. The cases

make it plain that such impact is not ascertainable merely by reason of the local nature of the employer's activity. A pertinent statement is found in National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 672, 83 L. Ed. 1014: "There are not a few industries in the United States which, though conducted by relatively small units, contribute in the aggregate a vast volume of interstate commerce. Some, like the clothing industry, are extensively unionized and have had a long and tragic history of industrial strife. It is not to be supposed that Congress, in its attempted nationwide regulation of interstate commerce through the removal of the causes of industrial strife affecting it, intended to exclude such industries from the sweep of the Act."

Equally pertinent is the statement in Polish National Alliance v. National Labor Relations Board, 322 U.S. 643, 648, 64 S. Ct. 1196, 1199, 88 L.Ed. 1509: "Congress has explicitly regulated not merely transactions or goods in interstate commerce but activities which in isolation might be deemed to be merely local but in the interlacings of business across state lines adversely affect such commerce. * * * Whether or no practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce."

In United States v. Women's Sportswear Mfrs.' Ass'n, 336 U.S. 460, at page 464, 69 S.Ct. 714, at page 716, 93 L.Ed. 805, the court in a Sherman Act case in discussing the effect of certain activities on commerce stated:

"This may or may not be the nature of their operation considered alone, but it does not matter. Restraints, to be effective, do not have to be applied all along the line of movement of interstate commerce. The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

It must be recognized, of course, that the cases cited and many others to which reference could be made were in response to an attack upon the jurisdiction of the Board because of the local nature of the enterprises involved. But even so, the courts in these and many other cases have fashioned a yardstick by which the impact on commerce is determinable, and we perceive no reason why the same yardstick should not be utilized in the instant and similar cases in measuring the impact which the Union's boycott had upon commerce. We do not think the Board has the unbridled discretion to evaluate such impact by any standard which its fancy may suggest as expedient in a particular case. This yardstick often employed by the Board and approved by the courts does not square with the Board's treatment in the instant case of the contractors separately and independently of each other and of the building and construction industry in the Joliet area purely as a local activity.

The Board places much reliance upon the decision of this court in Local Union No. 12, Progressive Mine Workers of America v. National Labor Relations Board, 7 Cir., 189 F.2d 1, and National Labor Relations Board v. Denver Building and Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. The reliance which the Board places on these cases does not strengthen its position in the instant case but emphasizes its weakness. In the case before this court, we affirmed the Board's dismissal of an unfair labor practice complaint and in doing so stated, 189 F.2d at page 4: "Applying the principles enunciated in the cases cited in this opinion, we are impelled to the conclusion that the Board had the power, in view of the facts in this case, to dismiss the proceedings on the ground that the impact on commerce was not substantial enough to warrant the exercise of jurisdiction, if in its opinion this

course could best effectuate the policies of the Act."

In that case, the industry involved was isolated and of minor significance. We agreed with the Board that the impact on commerce was not substantial. Here, the industry involved is of national scope and each of its segments is closely related and dependent upon the other for existence.

In the Denver case, which involved the building and construction industry, the Supreme Court sustained the Board's conclusion that commerce was substantially affected upon a showing which we think is far less convincing than that of the instant case. In doing so the court stated 341 U.S. at page 685, 71 S.Ct. at page 949:

"The maxim *de minimis non curat lex* does not require the Board to refuse to take jurisdiction of the instant case."

The maxim thus stated did not require the Board to refuse jurisdiction in that case and, conversely, so we think, the maxim does not permit it to refuse jurisdiction in the case before us. The Board, however, stresses the statement, 341 U.S. at page 684, 71 S.Ct. at page 949: "Even when the effect of activities on interstate commerce is sufficient to enable the Board to take jurisdiction of a complaint, the Board sometimes properly declines to do so, stating that the policies of the Act would not be effectuated by its assertion of jurisdiction in that case."

Presumably, the court was referring to a case where the impact on commerce was insubstantial. More pertinent to the instant situation, however, is the citation of Polish National Alliance v. National Labor Relations Board, 322 U.S. 643, 648, 64 S.Ct. 1196, 1199, 88 L.Ed. 1509, and the quote therefrom, footnote page 685 of 341 U.S., page 949 of 71 S.Ct. We have heretofore quoted this statement from the Polish National Alliance case but it is so pertinent and appropriate to the instant situation that it will bear repetition: "Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce."

In addition to the Denver case (the Gould case), the Supreme Court on the same date decided two other cases, International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (the Langer case), and Local 74, United Brotherhood of Carpenters & Joiners of America v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309 (the Watson case). In the latter cases, as in the Gould case, the court sustained the Board in its conclusion that the impact on commerce was substantial. We have been furnished with the briefs of the Board, filed in the Supreme Court in those cases. In discussing the legislative history of the 1947 amendment, the Board in the Watson case stated: "One of the express purposes of the Congressional sponsors of the legislation was to rid the building trades of the bane of secondary boycotts and jurisdictional strikes. * * * In view of Congress' observation that potentially the secondary boycott can create 'a chain reaction that will tie up the entire United States in a series of sympathetic strikes' (93 Cong.Rec. 4198, Leg.Hist., p. 1107), it is idle to argue that Congress was oblivious to and unconcerned with the consequences of secondary boycotts in the building construction industry upon the national economy."

In discussing the effect on commerce of the secondary boycott in the building and construction industry, the Board among other things argued: "Under familiar principles, there need be no showing in 'individual cases' of 'any specific effect upon interstate commerce.' Nor is it material that the specific activity immediately affected by the boycott, in these cases building construction, may be 'local' in character. In secondary boycott cases particularly, the decisive consideration is not 'how local the operation which applies the squeeze' but whether 'it is interstate commerce that feels the pinch.' * * * The Building construction industry is one of those which 'though conducted by relatively small units, contribute in the aggregate a vast volume of interstate commerce.' * * and the legislative history clearly shows that Congress specifically intended to sub-

ject secondary boycotts in the building construction industry to federal regulation."

The Board pointed out: "*De minimis* aside, application of the Act does not depend upon the volume of commerce which might be affected by such stoppage. * * Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which the courts would apply the maxim *de minimis*."

The Board asserted: "As was true of the activities involved in the Mandeville [Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328] and Wickard [Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122] cases, the impact of the building construction industry upon interstate commerce is undeniably huge."

The Board in the Langer case stated: "The operations pertaining to this house construction job, the Board found, are part of 'the web of commerce involved in the building and construction industry generally' which 'is nation-wide in scope, involves large interchanges of materials in interstate commerce, is highly complex in its requirements as to materials, has ramifications substantially affecting numerous and varied types of production activity, and accounts annually for an aggregate expenditure of many billions of dollars * *.' Thus, 'the value of all construction work in the United States during 1946 was $15,667,-000,000. New construction accounted for $10,007,000,000 of that total, of which $3,-300,000,000 was for new private residential construction.' "

True, these are isolated statements from the Board's brief, snatched from their context but, even so, we think they are relevant here. This is so notwithstanding that the Board in those cases was arguing in favor of its jurisdiction, while here it is contending that as a matter of administrative policy it was justified in dismissing the complaint because the impact on commerce was not substantial. The point is that the Board in arguing in favor if its jurisdiction went to great lengths to demonstrate not only that it was the Congressional purpose that it should assume jurisdiction of unfair labor practices in the building and construction industry but that such practices had a "huge" impact upon commerce. We are unable to discern how the Board with any sort of consistency can for one purpose maintain that the impact on commerce is substantial and for another purpose that it is insubstantial, assuming, of course, that it exceeds what has been referred to as *de minimis*.

The Board makes another argument which we think is without merit. In its brief it states: "Where the cut-off point will be set depends on a number of factors, which not only fluctuate, but are best evaluated by the Board itself—e. g., the size of the Board's appropriation, the number of cases anticipated, the expected proportion of representation to complaint cases, and the concentration of these cases in various industries."

None of the reasons thus stated were assigned by the Board as a basis for dismissal of the complaint. It was dismissed upon the Board's conclusion that the impact on commerce was insubstantial. Moreover, the case had been investigated, an injunction obtained by the Board in the District Court and a hearing had before a Trial Examiner who filed his intermediate report. No further action was called for except a decision by the Board.

In our view, the unfair labor activities shown and found had a substantial effect upon commerce, and the Board's conclusion to the contrary is clearly erroneous. Such being the case, we think the Board was without the discretionary authority to dismiss the complaint. In any event, its action was an abuse of any discretion which it had.

The order under review is set aside for such further proceedings as may, under the Act, be appropriate.

KERNER, Circuit Judge (dissenting).

The law is well settled that the task of administering the Act and formulating policy lies with the Board, which has considerable latitude to shape the remedy within the scope of its statutory authority, subject,

of course, to a limited judicial review. The rule is also established that where a determination has been left to an administrative body, the delegation of that authority must be respected and the administrative conclusion left untouched. It has been held that the Board has discretionary authority to decline jurisdiction where the impact on commerce is relatively insubstantial. Because the relation of remedy to policy is peculiarly a matter of administrative competence, we have been admonished not to enter the allowable area of the Board's discretion, and that we must guard against the danger of sliding from the narrow confines of law into the more spacious domain of policy. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271. Here, not only were factual questions involved, but questions of policy requiring the exercise of the judgment of the Board in employing the statutory powers. The Board found—amply supported by the evidence—that many of the employers involved in the proceeding were only remotely connected with the case; that they merely supplied materials to others; and that as to those employers who were directly involved, the operations were essentially local in character. Based on these facts, the Board concluded "that it would not effectuate the purposes or policies of the Act to exercise jurisdiction in this proceeding." Under the circumstances I cannot say that in so concluding the Board abused its discretion, hence I would dismiss the petition.