241 F.2d 147
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 1976, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA, AFL, and Los Angeles County District
Council of Carpenters and Nathan
Fleisher, Respondents.
 No. 15026.
 United States Court of Appeals Ninth Circuit.
 Feb. 12, 1957.
 
 Theophil C. Kammholz, General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D.C., and Norton J. Come, Washington, D.C., for National Labor Relations Board.
 Arthur Garrett and James M. Nicoson, Los Angeles, Cal., for Local 1976, United Brotherhood of Carpenters & Joiners, etc., et al.
 Before HEALY, LEMMON, and FEE, Circuit Judges.
 LEMMON, Circuit Judge.
 
 
 1
 While the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., hereinafter referred to as the Act, has been termed in 'its inception a novel experiment', which 'has remained a controversial piece of legislation',[1] its provisions dealing with secondary boycotts-- at least insofar as they are applicable to the instant case-- seem to us to be tolerably clear and eminently fair.
 
 1. Statement of the Case
 
 2
 The Sand Door and Plywood Company, of Los Angeles, California hereinafter Sand, on August 25, 1954, filed a charge against the respondents, hereinafter the Union, alleging that the latter had engaged in unfair labor practices within the meaning of 29 U.S.C.A. § 158(b)(4)(A).
 
 
 3
 On September 24, 1954, the General Counsel of the National Labor Relations Board, hereinafter the Board, before which the charge had been filed, presented a complaint against the Union, which in substance alleged that the Union, 'since on or about August 17, 1954, * * * (had) instructed the employees of Havstad & Jensen' at a certain college to be detailed hereinafter, and the employees of other employers, 'to refuse to install Paine Rezo doors (infra) because (the Union's) rules and by-laws prohibit the installation of products not bearing the union label,' etc. It was further alleged that by such conduct the Union had 'engaged in, and * * * induced and encouraged the employees of Havstad & Jensen and of other employers to engage in, strikes or concerted refusals in the course of their employment to use, manufacture, (etc.) * * * goods, articles, (etc.) * * * or to perform services.'The complaint also averred that an object of the Union's 'acts and conduct * * * is to force or require Havstad & Jensen, Watson and Dreps (infra) and other employers or persons to cease using, (etc.) or otherwise dealing in the products of Sand and Paine and to cease doing business with Sand and Paine'.
 
 
 4
 By the above acts, the complaint continued, the Union was engaging in unfair labor practices within § 158(b)(4)(A).
 
 
 5
 The Union's answer denied the commission of the unfair labor practices alleged, and affirmatively averred that 'the Board lacked jurisdiction over the subject matter of the complaint or of the persons of the respondents'.
 
 
 6
 On October 15, 1954, Sand filed a 'First Amended Charge', and on the same day the Board filed an 'Amendment to Complaint', neither of which materially altered their respective original allegations.
 
 
 7
 On December 13, 1954, the Trial Examiner filed an 'Intermediate Report and Recommended Order', in which it was 'recommended that the complaint be dismissed in its entirety'.
 
 
 8
 On August 26, 1955, the Board handed down a 'Decision and Order' holding that 'By inducing and encouraging employees of Havstad and Jensen to engage in a strike or concerted refusal in the course of their employment to handle or install doors manufactured by Paine Lumber company (hereafter Paine), an object thereof being to force and require Havstad and Jensen to cease using, handling or otherwise dealing in the products of Paine * * * and to force or require Sand * * * to cease doing business with Paine * * *, the (Union has) engaged in and (is) engaging in unfair labor practices within the meaning of Section 8(b) (4)(A) of the Act'. 113 NLRB 1210, No. 123.
 
 
 9
 The Decision and Order were signed by two members of the Board, including the chairman, and was specially concurred in by a third member. Two members dissented.
 
 
 10
 On February 3, 1956, the Board filed in this Court a petition for enforcement of the Board's order. It is that petition which we are here considering.
 
 2. Statement of Facts
 
 11
 Havstad and Jensen, joint venturers, were engaged in the construction of a hospital and other buildings on the campus of the College of Medical Evangelists, a medical school and nurses' training school owned and operated by the Seventh Day Adventists in Los Angeles.
 
 
 12
 Doors for the hospital, which was known as the White Memorial Hospital, were manufactured by Paine, and were purchased by Sand, a wholesale jobber and exclusive agent for Paine in Southern California. Sand sold the doors to Watson & Dreps, mill work contractors, with delivery between August 14, 1954, and August 17, 1954. Although counsel for the Union claims that 'The record does not show what Watson & Dreps did with these doors', there is testimony that delivery of the doors to the job, where Havstad & Jensen were in charge, commenced on the Friday before August 17, and that on August 17, a member of the firm of Watson & Dreps informed James C. Barron, vice president and general manager of Sand, that Emmett R. Jensen, one of the joint venturers with Larry C. Havstad, had reported 'that the carpenters on the job had refused to handle the doors because the doors did not have a union label.' This testimony provides a sufficient link between Watson & Dreps and Havstad & Jensen, as regards the doors.
 
 
 13
 Between 10 and 11 o'clock in the forenoon of August 17, 1954, Arnold Steinert, carpenter foreman of Havstad & Jensen, was told by Nathan Fleisher, business agent of Local 1976, one of the respondents herein, that 'we'd have to quit hanging the doors until they got it settled that they were union or non-union doors, and they were going to check on 'em and in a day or two they would be cleared and then we could go ahead and go to work * * * he said they were non-union doors, and they didn't have a label and we'd have to quit hanging the doors until it was settled.'
 
 
 14
 Earlier in the morning, Steinert had assigned laborers 'to move the doors from floor to floor, the doors that went on each floor'. He had also assigned Sam Agronovich, a carpenter, to start hanging doors. When Steinert received the order from Fleisher 'to quit hanging the doors', he proceeded to carry out the mandate:
 
 
 15
 'Well, the laborers were moving the doors from floor to floor so I told them to leave them alone, leave 'em set and we went down into the basement where Sam Agronovich was working and told him we'd have to quit hanging the doors because they weren't union until they got it settled.'
 
 
 16
 Fleisher was present when Steinert talked to Agronovich.
 
 
 17
 When James Layton Nicholson, Havstad & Jensen's general superintendent of construction on the White Memorial Hospital project, arrived at his office that same morning, he was informed by the firm's secretary that 'Fleisher had been on the job and had called the carpenters off from hanging the doors.' Nicholson went to the jobsite and 'observed that the laborers that (were) supposed to be placing the doors were not working at the time'. When he asked the laborers for the reason, 'All they said is that the union stopped them from hanging the doors, * * * and they (were) waiting for my foreman to replace them, or, in other words, give them other duties. * * *'
 
 
 18
 Nicholson found Fleisher, who was also at the building site, and asked him why he had stopped the men from hanging the doors. The following conversation, according to Nicholson, ensued:
 
 
 19
 'He says he had orders from the District Council that morning to stop them from hanging the doors until they could establish the fact whether they were union or non-union made doors. He says, 'I could have pulled them off yesterday but I waited until today.' And I told him at the time that, well, I says that I always thought I should have notice before anybody could be pulled off, and he says, 'Well, those are my orders', so he says 'We will have to stop hanging the doors until they get cleared by the union'.'
 
 
 20
 At that juncture, Sam Agronovich and Saul Agronovich, the latter being the steward and also a carpenter, came up. Superintendent Nicholson at first told them that 'if we can't hang the doors they might as well pick up their tools.' Later Nicholson reconsidered the matter and told Steinert 'to relocate the men and in such a way they could keep on working.'
 
 
 21
 On that day and the next, James C. Barron, the Sand executive, supra, got into touch by telephone with Earl Thomas, of the Los Angeles County District Council of Carpenters. In a second conversation Thomas informed Barron that he had received a telegram from a union officer in Wisconsin, informing him that 'the doors were not union made and that Paine * * * did not belong to any union.' According to Barron, the following conversation then ensued:
 
 
 22
 'I replied to him that-- 'Well, what are we going to do here, because the doors are here, and we are an innocent bystander? We are union and Watson & Dreps are union and the contractors are union, even the people that hauled the doors out here on the train were union people.' He said, 'Well, * * * under the circumstances, we can't hang non-union doors,' but he said to me, 'Why don't you buy union doors?"
 
 
 23
 Barron also talked to Fleisher, who told him 'that the doors don't have a union label, and they have to be cleared before I can permit them to be hung.'
 
 
 24
 Jensen, of Havstad & Jensen, also talked to Thomas, who told him that he had found out that Paine 'was not a union operation,' and 'that the carpenters would not be able to handle those doors'.
 
 
 25
 On Tuesday, October 5, 1954, after Sand had filed the instant charges and the Board had sought a temporary restraining order, Superintendent Nicholson, who was himself 'a union man', and Steinert asked each carpenter, separately, whether he 'would be willing to hang the doors', and from each there was received a negative reply, though some of the carpenters qualified their answers by saying that they would hang the doors if they 'could get clearance' on them, or if the doors 'were released'.
 
 
 26
 The 'By-Laws and Trade Rules' of the District Council of Carpenters of the United Brotherhood of Carpenters of America, of which Steinert was a member, provided that 'Only members of the * * * Brotherhood * * * shall be permitted to do carpenter work on any job', and that 'No member shall use, handle, install or erect any material produced or manufactured from wood that is not produced and manufactured by members of the * * * Brotherhood * * *.'
 
 
 27
 Similarly, the 'Labor Agreement Between Southern California General Contractors and United Brotherhood of Carpenters and Joiners of America,' hereinafter 'Labor Agreement', contains the following provision:
 
 
 28
 'Workmen shall not be required to handle non-union material.'
 
 
 29
 The crucial question in this connection is whether such a provision justifies a work stoppage by the employees.
 
 3. The Applicable Statute
 
 30
 ' § 158. Unfair labor practices
 
 
 31
 '(b) It shall be an unfair labor practice for a labor organization or its agents--
 
 
 32
 '(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *.'
 
 
 33
 4. The Board's Assertion of Jurisdiction was Proper
 
 
 34
 Before the trial examiner, it was stipulated that in 1953, Sand received from Paine, the headquarters of which was at Oshkosh, Wisconsin, materials, including doors, valued at $185,796.84. From January 1, 1954, to September 8, 1954, inclusive, Sand received from Paine, materials, including doors, valued at $103,503.05. The doors in controversy are valued at $9,148.32. Sand received the doors between August 10 and August 14, 1954, and notified Watson & Dreps, the buyers, who took delivery at Sand's warehouse during the period between August 14 and August 17. We have already traced the delivery of the doors from Watson & Dreps to Havstad & Jensen.
 
 
 35
 In other words, Paine, whose products were the real target of the Union's actions, shipped materials valued at more than $100,000 from its Wisconsin plant to Sand, its Southern California distributor, during the first nine months of 1954, the crucial period here.
 
 
 36
 The Union, by refusing to use the doors on the Havstad & Jensen hospital job in Los Angeles, thereby interfered with more than a so-called de minimis flow of shipments into California. This is sufficient to bring the Union's obstructionist activities within the Board's legal jurisdiction.
 
 
 37
 In National Labor Relations Board v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 683-684, 71 S.Ct. 943, 949, 95 L.Ed. 1284, the Board had found that the activities complained of had had a sufficient impact upon interstate commerce to sustain its jurisdiction, and the Court of Appeals was satisfied. The Supreme Court commented that 'We see no justification for reversing that conclusion,' and added:
 
 
 38
 'The Board found that, in 1947, Gould & Preisner purchased $86,560.30 of raw materials, of which $55,745.25, or about 65%, were purchased outside of Colorado. Also, most of the merchandise it purchased in Colorado had been produced outside of that State. While Gould & Preisner performed no services outside of Colorado, it shipped $5,000 of its products outside of that State. Up to the time when its services were discontinued on the instant project, it had expended on it about $315 for labor and about $350 for materials. On a 65% basis, $225 of those materials would be from out of the State. The Board adopted its examiner's finding that any widespread application of the practices here charged might well result in substantially decreasing the influx of materials into Colorado from outside the State and it recognized that Gould & Preisner's annual purchase of over $55,000 of such materials was not negligible.
 
 
 39
 'The Board also adopted the finding that the activities complained of had a close, intimate and substantial relation to trade, traffic and commerce among the states and that they tended to lead, and had led, to labor disputes burdening and obstructing commerce and the free flow of commerce. The fact that the instant building, after its completion, might be used only for local purposes does not alter the fact that its construction, as distinguished from its later use, affected interstate commerce.'[2]
 
 
 40
 It is immaterial, so far as the Board's legal jurisdiction is concerned, that Havstad & Jensen obtained the doors from Paine from an intermediary in California-- Watson & Dreps-- rather than by direct shipment from out of the State. See National Labor Relations Board v. Cowell Portland Cement Co., 9 Cir., 1945, 148 F.2d 237, 242, certiorari denied, 1945, 326 U.S. 735, 66 S.Ct. 44, 90 L.Ed. 438; National Labor Relations Board v. Townsend, 9 Cir., 1950, 185 F.2d 378, 382-383, certiorari denied, 1951, 341 U.S. 909, 71 S.Ct. 621, 95 L.Ed. 1346.
 
 
 41
 We agree with the Board that the Trial Examiner erroneously designated Havstad & Jensen as the primary employer, in considering whether jurisdiction was to be asserted. Havstad & Jensen was a neutral employer whose carpenters were unlawfully induced by Fleisher, via Steinert, to refuse to install the doors in question. Paine was the primary employer, for it was Paine's products to which the Union objected. Havstad & Jensen was the secondary employer.
 
 
 42
 It is clear, then, that the dispute had a sufficient impact upon commerce to be subject to the Board's jurisdiction as a matter of law. We next address ourselves to the question of whether the Board should have assumed jurisdiction in the instant case. In other words, does the present controversy meet what the Union terms the Board's 'monetary' standards?
 
 
 43
 In Jonesboro Grain Drying Co-operative, Case No. 32-RC-693, 110 NLRB 481, 483, No. 67, decided on October 26, 1954, the Board announced, inter alia, the following jurisdictional standard:
 
 
 44
 'Accordingly, we have determined that in future cases the Board will assert jurisdiction over enterprises which annually meet one or more of the following standards:
 
 
 45
 '(2) Direct outflow standard:
 
 
 46
 An enterprise which produces or handles goods and ships such goods out of State, or performs services outside the State in which the enterprise is located, valued at $50,000 or more.'
 
 
 47
 In Truck Drivers Local Union No. 649 (Jamestown Builders Exchange), Case No. 3-CC-19, 93 NLRB 386, 387, No. 51, decided on February 23, 1951, the Board said:
 
 
 48
 'By its very nature the effect of a secondary boycott extends beyond the operations of the primary employer with which the union is engaged in a dispute, and reaches the secondary employers whom the Union is attempting to force or require to cease dealing with the primary employer by means prescribed in Section 8(b)(4) (29 U.S.C.A. § 158(b)(4), supra).'
 
 
 49
 Chief Judge Clark, in National Labor Relations Board v. Associated Musicians, etc., 2 Cir., 1955, 226 F.id 900, 907, certiorari denied, 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483, commented:
 
 
 50
 'In any event it is doubtful under the Act whether coverage of the secondary employer need be established independent of coverage of the primary employer. * * * We think the better view is that the secondary activity is but an extension of the labor dispute with the primary employer and that the businesses of both employers are to be considered in determining jurisdiction of the secondary activity. The opposite conclusion would require the fragmenting of the authority of the Board over labor disputes-- a result which, lacking specific legislative command, we should shun. (Citing Jamestown Builders Exchange, supra, and McAllister Transfer case, infra.)'[3]
 
 
 51
 Finally, as Judge Mathews observed in National Labor Relations Board v. Stoller, 9 Cir., 1953, 207 F.2d 305, 307, certiorari denied, 1954, 347 U.S. 919, 74 S.Ct. 517, 98 L.Ed. 1074, 'The general rule is that, where the Board has jurisdiction, as it had in this case, whether such jurisdiction should be exercised is for the Board, not the courts, to determine.'
 
 
 52
 The Board's assertion of jurisdiction in the instant case was proper.
 
 
 53
 5. The Board was Correct in Finding That the Union Violated the Act by Inducing Employees of Havstad & Jensen to Refuse to Install Paine Doors
 
 
 54
 As we have seen, the evidence shows that there is no serious question that Steinert, following Fleisher's instructions, caused employees of Havstad & Jensen to engage in a concerted work stoppage for the object forbidden by Section 8(b)(4)(A).
 
 
 55
 The union contends that 'If this idleness can be termed a work stoppage, it is clear that the cessation did not originate with the employees but was a direct result of managerial orders.' It is also urged that 'Havstad & Jensen were parties to and bound by a collective bargaining agreement whereby they had previously agreed not to require 'workmen to handle non-union materials'.'
 
 
 56
 In our view, there was inducement to a concerted refusal in the statutory sense, not authorized by the contract between Havstad & Jensen and the Union. An employer may well remain free to decide, as a matter of business policy, whether he will accede to a union's boycott demands, or if he has already agreed to do so, whether he will fulfill his agreement. An entirely different situation, however, is presented under § 8(b)(4)(A) of the Act, 29 U.S.C.A. § 158(b)(4)(A), supra, when it is sought to influence the employer's decision by a work stoppage of his employees. Such a work stoppage, Congress has plainly declared, is unlawful, when the object-- clearly present here-- 'is * * * forcing or requiring any employer * * * to cease using * * * the products of any other * * * manufacturer, or to cease doing business with any other person'.
 
 
 57
 In the instant case, we have seen that, despite the 'hot cargo' provision in the contract, supra, the employees had actually been handling Paine doors. They ceased doing so only upon Fleisher's and Steinert's orders. Those orders, we think, were in direct contravention of the mandate.
 
 
 58
 In National Labor Relations Board v. Washington-Oregon Shingle Weavers' Dist. Council, 9 Cir., 1954, 211 F.2d 149, 152, we said:
 
 
 59
 'The prohibited object of the boycott is stated by the statute to be 'forcing * * * any employer or other person to cease using * * * the products of any other producer, processor, or manufacturer * * *.' In fact, if the object is sought, not because of any dispute, but merely because the union dislikes the other producer for any reason, or for no reason, the conduct would appear even more reprehensible. * * * The only dispute between the Union and the Company was over the latter's use of unfair shingles, and had no bearing on wages, working conditions, etc. In such a case, a strike called by the Union can have no other purpose than to compel the Company to cease using what the Union considers unfair shingles.
 
 
 60
 'Furthermore, the legislative history of the Act (infra) clearly shows that Congress intended to proscribe exactly the type of union action involved here.'
 
 
 61
 In General Drivers, etc., and American Iron and Machine Works Company, No. 121, 115 NLRB 800, 801, decided on March 15, 1956, the Board said:
 
 
 62
 '1. We find, as did the Trial Examiner, that Respondent Teamsters, by its inducement of Employees of the common carriers (secondary employers) to engage in a concerted refusal in the course of their employment to handle freight brought by American Iron and Machine Works Company (the primary employer) to the carriers' docks, with an object of forcing or requiring the carriers to cease doing business with American Iron, violated Section 8(b)(4)(A) of the Act.
 
 
 63
 'Like the Trial Examiner, we reject the contention of Teamsters that its conduct was excused by the 'hot cargo' clause in the Teamsters' contracts with the common carriers. This clause provided that members of Teamsters 'shall not be allowed to handle or haul freight to or from an unfair company'. However, in rejecting this defense, we do not rely, as did the Trial Examiner on (McAllister Transfer, Inc., 110 NLRB 1769) but rather on the more recent Board decision in (Sand Door and Plywood Co., 113 NLRB 1210, No. 123, decided August 26, 1955)[4] which was decided after the issuance of the Intermediate Report in the case at bar. As stated in the principal opinion in that case, regardless of the existence of a 'hot cargo' clause, any direct appeal to employees by union to engage in a strike or concerted refusal to handle a product is proscribed by the Act when one of the objectives set forth in Section 8(b)(4)(A) is present. Thus, while Section 8(b)(4)(A) does not forbid the execution of a hot cargo clause or a union's enforcement thereof by appeals to the employer to honor his contract, the Act does, in our opinion, preclude enforcement of such clause by appeals to employees, and this is so whether or not the employer acquiesces in the union's demand that the employees refuse to handle the 'hot' goods.'
 
 
 64
 Similarly, in International Brotherhood of Teamsters, etc., and McAllister Transfer, Inc., 110 NLRB 1769, No. 224, supra, decided on December 16, 1954, the Board used the following language:
 
 
 65
 'We are concerned here with clauses in collective-bargaining agreements, commonly known as 'hot cargo' clauses, which provide that the Union and employees may refuse to handle goods designated as 'unfair' and that such refusal shall not be deemed a violation of the contract or cause for discharge. * * * The Respondents in the instant case, as part of their efforts to force McAllister's employees to join their locals, determined that McAllister freight was 'unfair'. The Respondents thereupon engaged in a boycott of McAllister freight through other common carriers, * * * with which they had contracts containing so-called 'hot cargo' clauses. * * *
 
 
 66
 'Essentially, then, the basic question, as we see it, is whether these (hot' cargo') clauses constitute a meritorious defense to the complaint which alleges violations of Section 8(b)(4)(A) and (B).
 
 
 67
 'In enacting these provisions of the Act, it is clear that Congress declared a public policy against all secondary boycotts, without distinction as to type or kind.
 
 
 68
 'As the late Senator Taft stated in the course of the legislative debate:
 
 
 69
 'The Senator will find a great many decisions * * * which hold that under the common law a secondary boycott is unlawful. Subsequently, under the provisions of the Norris-LaGuardia Act, it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. All this provision of the bill does is to reverse the effect of the law as to secondary boycotts. Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have broadened the provisions dealing with secondary boycotts as to make them an unfair labor practice.' 93 Cong.Rec. 4323.
 
 
 70
 'More specifically, Senate Report No. 105 on S.1126 stated:
 
 
 71
 'Because of the nature of certain of these practices, especially jurisdictional disputes and secondary boycotts and strikes for specifically defined objectives, the committee is convinced that additional procedures must be made available under the National Labor Relations Act in order adequately to protect the public welfare which is inextricably involved in labor disputes.
 
 
 72
 'Hence, we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices and that it shall also seek such relief in the case of strikes and boycotts defined as 'unfair labor practices.'
 
 
 73
 'We deem it significant that Congress spoke in unmistakable terms of the protection of 'the public welfare which is inextricably involved' in such disputes, and pointedly characterized the Board as 'acting in the public interest and not in vindication of purely private rights'. It is of course, a necessary concomitant of the protection of the public welfare that protection is also extended to employees and employers as well. But it is only fair to say that such protection to private interests was in no way intended by Congress to detract from the public interest that constitutes the very foundation of the policies implicit in these statutory enactments. It has by this time become axiomatic that the exclusive grant of authority to the Board to prevent unfair labor practices affecting commerce was to insure that the existence of some private agreements at odds with the statute does not preclude the Board from acting in the public interest. * * *
 
 
 74
 '* * * we necessarily feel constrained to pass on the validity of the 'hot cargo' clauses offered as a defense for the Respondent's conduct, and to make the unequivocal finding that such clauses are contrary to public policy and cannot therefore serve as a defense.'
 
 
 75
 As was observed by Judge Bratton in National Labor Relations Board v. United Brotherhood of Carpenters and Joiners, etc., 10 Cir., 1950, 184 F.2d 60, 64, certiorari denied, 1951, 341 U.S. 947, 71 S.Ct. 1011, 95 L.Ed. 1371, 'The basic purpose and objective of the section of the Act is to prohibit the involvement of employers in labor disputes of other employers with whom they are doing business.'
 
 
 76
 Finally, we consider the Union's argument that the work stoppage 'was a direct result of managerial orders'. That contention is based upon the theory that Steinert, the foreman, 'acted solely as a representative of management when he instructed employees to cease their work on the doors'.
 
 
 77
 Steinert was a member of Local 563 of the Union. The By-Laws and Trade Rules of the Los Angeles County District Council of Carpenters required that he belong to the Union, and that he should hire no non-union members. As foreman, he and the steward were 'equally responsible for the enforcement of all By-Laws and Trade Rules,' etc. Violators of that rule were 'subject to a fine of $100.00 and/or expulsion'.
 
 
 78
 Therefore, when Fleisher ordered Steinert to stop work on the doors because they were non-union, it is logical to assume that he was invoking Steinert's obligations under the Union's rules. Cf. National Labor Relations Board v. Cement Masons Local No. 555, 9 Cir., 1955, 225 F.2d 168, 173-174, and cases there cited.
 
 
 79
 The fact that in some respects foremen, as has been said of buyers, 'may also be agents of employers does not eliminate them from the scope of' 158(b)(4) (A). Amalgamated Meat Cutters, etc. v. National Labor Relations Board, D.C., Cir., 1956, 237 F.2d 20, 23.
 
 
 80
 The Union seeks to brush aside the force of its own rules by quoting the closing clause of Article XIII of the 'Labor Agreement Between Southern California General Contractors and United Brotherhood of Carpenters and Joiners of America', which reads as follows:
 
 
 81
 '* * * that any provision in the working rules of the Unions, with reference to the relations between the Contractors and their employees, in conflict with the terms of this Agreement shall be deemed to be waived and any such rules or regulations which may hereafter be adopted by the Unions shall have no application to the work hereunder.'
 
 
 82
 The above rule is not applicable here. We are not now concerned with Steinert's 'relations' to 'the contractors', but with his 'relations' to his Union and his status and obligations therein. No contract with his employers could interfere with those relations, so long as he remained a member of the Union, which he indubitably was. So long as he remained a member, he was bound by the Union rules governing his relations to the Union. The proposition is so plain as to require no further elaboration.
 
 
 83
 Nor could Steinert 'waive' the Union's power to fine him $100 for violating the subsection of the 'By-Laws and Trade Rules' holding him jointly responsible with the steward for their enforcement.
 
 
 84
 We hold that the Board was correct in holding that the Union, through its foreman Steinert and its business agent Fleisher, violated § 158(b)(4)(A) by ordering employees of Havstad & Jensen to refuse to install Paine doors.
 
 6. Conclusion
 
 85
 Accordingly, we hold that the Board's assertion of jurisdiction was proper, and that it was correct in finding that the Union violated the Act by ordering employees of Havstad & Jensen to refuse to install doors that had been manufactured by Paine.
 
 
 86
 A decree should issue enforcing the Board's order in full.
 
 
 
 [1]
 Proposals for Modification of Unfair Labor Practice Procedures Under the NLRA, Stanford Law Review, December, 1956, Vol. 9, No. 1, p. 155 et seq
 
 
 [2]
 See also Local 74, United Brotherhood of Carpenters & Joiners of America v. National Labor Relations Board, 1951, 341 U.S. 707, 712, 71 S.Ct. 966, 95 L.Ed. 1309
 
 
 [3]
 See also Joliet Contractors Ass'n v. National Labor Relations Board, 7 Cir., 1952, 193 F.2d 833, 840
 
 
 [4]
 -- The instant case